[No. A056012. First Dist., Div. Two. Sept. 2, 1993.]

RICHARD FRAZER et al., Plaintiffs and Appellants, v.
DIXON UNIFIED SCHOOL DISTRICT et al., Defendants and
Respondents.

Michael D. Imfeld for Plaintiffs and Appellants.

Thomas H. Gordinier, County Counsel, Vicki Sieber-Benson, Assistant County Counsel, and Harry B. Wyeth, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**PHELAN, J.**—Appellants Richard and Debbie Frazer (appellants) timely appeal from the denial of their petition for a writ of mandate and for declaratory relief against respondents Dixon Unified School District and its governing board (Board) and superintendent, J. Gerry Laird (Superintendent) (collectively, hereafter respondents or the District), which was originally filed in Solano Superior Court in May 1990. By their petition, appellants sought to compel respondents to establish a second task force to conduct an open, public review of the District's K-5 language arts curriculum—the so-called "Impressions" series. The Impressions materials had been approved by the District a year earlier, in May 1989, after a one-year pilot project and a six-week period for public viewing of the proposed materials, at the recommendation of the District's Language Arts Task Force (LATF). The adoption of the Impressions curriculum was confirmed in May 1990 by a hearing committee which was appointed by the District Superintendent to review the LATF decision in light of parental complaints that the new curriculum was unwholesome, encouraged disobedience and antisocial behavior, contained satanic and morbid material, and introduced warped rituals.[1]

In their fourth amended petition, which was tried to the court on June 13, 1991, appellants alleged that the District failed to comply with its obligations under Education Code section 60262 and Board Policy 7135 regarding involvement of parents in the original selection of the Impressions materials. Appellants further alleged that, when a small group of parents complained in February 1990 about the use of the Impressions series in their children's classrooms, the District violated the Ralph M. Brown Act (the Brown Act) (Gov. Code, §§ 54950-54960)[2] and the Education Code by conducting secret meetings and excluding anti-Impressions parents from full participation in the process established for review of the complaints. Appellants also alleged that the District's actions violated the constitutional guarantees of due process and equal protection, and their right to petition the government to redress grievances.

We conclude that there is substantial evidence to support the trial court's decision that the District did not violate the Education Code or its own policies regarding parental involvement in the original selection of the Impressions series. The record also amply supports the trial court's ruling

---

[1] The District received two formal complaints, one from John and Diane Ford on February 2, 1990, and one from Cynthia Lee on February 7, 1990. Although the Fords joined in the petitions below, they are not parties to this appeal.

[2] Unless otherwise indicated, all further statutory references are to the Government Code.

that appellants were not deprived of any constitutional right. Accordingly, we affirm the trial court judgment on the first and fourth causes of action in appellants' petition.

We further conclude, however, that a gathering of a quorum of the Board at a joint "Curriculum Council/Board Work Session" on February 28, 1990, at which the Board members viewed a videotape, entitled "Holy Wars in Education," and at which discussion was held to bring the participants up to date on the review process for the parents' complaints, was a "meeting" within the meaning of section 54953, in that it consisted of "collective acquisition and exchange of facts preliminary to the ultimate decision" on a pending dispute within the Board's purview. We also hold that the hearing and review committees appointed by the District pursuant to a written board policy were "advisory" committees within the meaning of section 54952.3, whose meetings and deliberations were subject to the Brown Act. Because both the February 28th meeting and the meetings of the review and hearing committees were undisputedly closed to members of the public, we reverse the trial court judgment on the second and third causes of action in appellants' fourth amended petition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In October 1988, the District's LATF undertook a search for a new set of elementary-level reading books.[3] Out of 17 contenders, the LATF narrowed the field to 6 reading book series, which were "piloted"[4] by several teachers in several different grades during the 1988-1989 school year. The District presented evidence indicating that the six sets of finalist books were on display from late February through early June of 1989, and that a notice regarding the textbook selection process was published in the local newspaper, the Dixon Tribune, on March 17, 1989. The District also presented evidence that its director of instruction, Marilys Tognetti, spoke to the elementary school parents' association about the book selection process in February 1989, and that the elementary school teachers and administrators encouraged parental review of the pilot textbooks at parent-teacher conferences and open houses in April 1989.

In May 1989, the LATF met with the piloting teachers, publishers' representatives, and with representatives of each affected grade level to discuss the final selection of a textbook series. The Impressions series was

[3]The LATF consisted of only District employees, some of whom were also parents of children who attended District schools; it did not include any nonemployee parents.

[4]Among professional educators, the term "pilot" is used as a verb to describe a process by which competing sets of proposed instructional materials are used, on a trial basis, before a final selection and decision to purchase are made.

the unanimous choice of the grade-level representatives. The Board approved the selection of the Impressions materials on May 18, 1989, and obtained necessary approvals from the State Board of Education for their purchase in July 1989.

There is no evidence of any complaint about the Impressions series at any time during the pilot period, or during the first half of the 1989-1990 school year. In early February 1990, however, two sets of parents filed written complaints and requested review of the Impressions materials pursuant to Board Policy 7138.[5] The District immediately responded by establishing a review committee (consisting of teachers and parents who had firsthand experience with the Impressions curriculum) to investigate the merits of the complaints, and a hearing committee (consisting of District employees and community members with no working knowledge of Impressions) to hear testimony from the review committee and complainants, and to make a recommendation to the Board regarding the continued use of the Impressions series. Appellant Debbie Frazer asked to be appointed to the review committee, but was rejected because she was "unalterably opposed to use of the Impressions series of books." Of the 21 members of the review committee, 17 were District employees and 4 were parents (including 1 substitute teacher), none of whom objected to the Impressions series.

The issue of the Board's role in the establishment and conduct of the review procedures is hotly contested. There is evidence that the Board directly delegated to the Superintendent the responsibility to conduct a review of the parents' complaints in accordance with Board Policy 7138. The Superintendent does not deny that the Board made such a delegation and, in fact, confirms that he consulted with unspecified Board members beginning in early February about how to handle the complaints. The

---

[5]Board Policy 7138 is entitled "COMPLAINTS ABOUT INSTRUCTIONAL MATERIALS." It provides, in relevant part, that:

"2. Recognizing that the final decision for controversial reading matter shall rest with the Board, . . . the Board has adopted the following policy for dealing with censorship of books or other materials.

". . . . . . . . . . . . . . . . . . . . . . .

"2.3 Any parent who wishes to request reconsideration of the use of any book in the school must make such a request in writing on forms available from site principals. The statement must be signed and identified so that a reply may be given.

"2.4 A committee of the principal and two teachers, appointed by the principal, shall review the material and judge whether it conforms to the above-stated principles, and submit its report in writing to the parent with a copy to the Superintendent.

"2.5 If the matter cannot be resolved at the site level, then the written criticism along with the principal's evaluation will be forw[a]rded to Superintendent for presentation to the Curriculum Council. The Curriculum Council will forward its recommendation to the Superintendent, who will make the final decision. The concerned parties will be notified of the final disposition in writing."

Superintendent also admits that he followed the basic approach of Board Policy 7138.[6] He testified only that the Board did not instruct him to establish the particular procedures that were followed in this case, or to appoint particular members of the committees.

On a list of meetings to occur during the review process established by the Superintendent and his staff, the Board was scheduled for a "Possible Curriculum Council/Board Work Session" to be held on February 28, 1990, from 10 a.m. to noon.[7] It is undisputed that the meeting was actually held, that it was not open to the public, that a quorum of three Board members were in attendance, that all three Board members viewed a videotape "Holy Wars in Education" (described in the meeting minutes as a censorship film), and that "Discussion was held regarding recent complaints received about our adopted language arts series" in connection with an agenda item denoted as an "Update on Language Arts Program."[8] It is also undisputed that the curriculum council was overseeing the work of the review and hearing committees.

There is conflicting evidence, however, whether the Board members who attended the February 28 meeting were present for, heard, or participated in the discussion of the parents' complaints. In "carbon-copy" declarations, the three Board members all testified that they were present for at least one hour of "discussion" and for the videotape viewing, but that there was no discussion about the Impressions series itself, and no discussion after the videotape was shown. At least one of those declarants, Board member Lisa Seifert, flatly contradicts her earlier deposition testimony, in which she admitted that she did hear some discussion about the Impressions curriculum. One other Board member's declaration testimony squarely contradicts her prior deposition testimony about the time she arrived and left the February 28 meeting, and the declarations of all three Board members conflict with the existing

[6]According to the Superintendent, Board Policy 7138 was originally designed to address individual parental complaints about the use of a particular book in their child's classroom. The procedure was to have the principal and two teachers from the child's school study the complaint and issue its recommendation as to the disposition of the matter. In this case, the Board Policy had to be adapted to provide a mechanism for resolving appellants' across-the-board challenge to an entire textbook series that was in use at multiple grade levels. Thus, the review committee had representatives from the affected elementary and middle schools, and a more broad-based hearing committee was established to study the complaints and hear from the complainants and other members of the public regarding the Impressions curriculum.

[7]The curriculum council consists of "[a]ll the managers in the District," including the Superintendent, the director of instruction, principals and vice principals from various District schools, and other District employees. There was some overlap between the curriculum council and the review and hearing committees.

[8]The two Board members who did not attend the February 28 meeting later viewed the videotape in their own homes.

documentary evidence regarding the time the February 28 meeting began and ended.

Besides the February 28, 1990 meeting, the Board received a series of written communications from the Superintendent and his staff about the Impressions controversy. By memoranda dated February 8 and 13, 1990, the Board was advised of the appointments to the review committee and was provided copies of an education journal article entitled, "Holy Wars in Education." By memorandum dated February 23, Ms. Tognetti set forth the tentative schedule of meetings and activities for the review and hearing committees and provided the Board and committee members with certain materials, with the admonishment that the enclosed materials were for "Your Eyes Only." Included among those materials were (1) Ms. Tognetti's own analysis of the parents' complaints, (2) the "Holy Wars" article, (3) an article entitled "Experts Warn of Attempts to Censor Classic Texts," and (4) reports of two other school districts that had retained the Impressions curriculum despite protests by parents.

Apparently, the review committee met at least twice, on February 23 and 26, 1990, before making its formal presentation to the hearing committee at a meeting on March 29, 1990. Two pro-Impressions parents (members of an independent, ad hoc group called "Concerned Citizens of Dixon," which was organized in March 1990 to support the Impressions curriculum) were each allowed a few minutes to speak during the one and a half hours allotted to the review committee during the closed meeting on March 29, 1990. Although appellants and other complaining parents were excluded from the entire review committee presentation, they were given an hour and a half to present their own views about the Impressions series to the hearing committee—again in closed session.

After its March 29, 1990, meeting, the hearing committee recommended that the District retain the Impressions curriculum. That recommendation was relayed to the Board by the Superintendent. On April 5, 1990, the Board took up the Impressions controversy at an open, regular meeting before making the final decision about the parents' complaints. At that meeting, which was so well attended by members of the press and the public that it had to be moved to a school gymnasium, the Board heard from both supporters and opponents of the Impressions curriculum and, thereafter, voted to retain the Impressions series in District schools.

After several rounds of demurrers, appellants' fourth amended petition was tried to the court on June 13, 1991, on the basis of documentary

evidence and declaration and deposition testimony.[9] The trial court issued its statement of decision on September 19, 1991, denying all relief sought by appellants. After denial of their motion for new trial, appellants timely filed their notice of appeal on December 19, 1991.

## II. DISCUSSION

A. *Whether the Trial Court Erred in Sustaining a Demurrer to Appellant's Second Amended Petition.*

Appellants first argue that the trial court erred in sustaining a demurrer to the fourth, fifth, sixth, and seventh causes of action in their second amended complaint. In reviewing the trial court's order to that effect, filed November 2, 1990, we accept as true all material facts pleaded in the petition. (See *Stockton Newspapers, Inc.* v. *Redevelopment Agency* (1985) 171 Cal.App.3d 95, 99 [214 Cal.Rptr. 561].)

1. *Whether Appellants Sufficiently Alleged a Violation of Education Code Section 35145.5 by Asserting That the Board Rejected Ms. Frazer's Timely Demand to Address the March 15, 1990, Meeting of the Board.*

In the fourth and fifth causes of action, appellants alleged that the District violated both the Brown Act and Education Code section 35145.5 by refusing to allow them to place an item on the agenda of and to address the March 15, 1990, "special meeting" of the Board, and sought mandamus and declaratory relief to correct the past, and prevent any future, violations of these provisions. The superior court sustained respondents' demurrer to these causes of action on the ground that 1986 amendments to the Brown Act and to Education Code section 35145 (Stats. 1986, ch. 641, §§ 2, 5, pp. 2156-2158), preempted and superseded Education Code section 35145.5, eliminating the right of members of the public to place matters directly related to school district business on the agenda of school district governing board meetings, and to address the board regarding items on the agenda as such items are taken up. We disagree, in part, with the trial court's statutory interpretation, but agree with its conclusion.[10]

" '[T]here is a presumption against repeals by implication; they will occur only where the two acts are so inconsistent that there is no possibility

---

[9]Contrary to the statement of decision, the trial court did not allow any live testimony by witnesses for either side. Appellants did not present any declarations, but were allowed to present some deposition testimony to impeach certain of the 10 declarations respondents presented. Although respondents apparently did not serve their declarations until the time of the hearing, appellants agreed to proceed and declined the court's offer of a continuance.

[10]Respondents argued below—and in a previous writ proceeding in this court—that Government Code section 54954.3 "preempts" or "supersedes" Education Code section 35145.5. The trial court adopted respondents' reasoning on this point. On appeal, respondents have

of concurrent operation, or where the later provision gives undebatable evidence of an intent to supersede the earlier; the courts are bound to maintain the integrity of both statutes if they may stand together. . . .' " (*Hays* v. *Wood* (1979) 25 Cal.3d 772, 784 [160 Cal.Rptr. 102, 603 P.2d 19], citations omitted, quoting from *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 54 [69 Cal.Rptr. 480].)

We believe that the 1986 amendments to the Education and Government Codes can be harmonized with the preexisting provisions of Education Code section 35145.5. In reality, what the Legislature accomplished by those amendments (Stats. 1986, ch. 641, §§ 5-6, pp. 2157-2158) was to codify certain judicially and locally created requirements relating to the posting of and adherence to an agenda—requirements that had been applicable to school boards since 1978—to make those requirements more uniform and generally applicable to all regular meetings of the "legislative body" of all local agencies governed by the Brown Act. (See *County of El Dorado* v. *Reed* (1858) 11 Cal. 130, 132; and see generally, 1 Ogden, Cal. Public Agency Practice (1993), § 13.04(2)(b).)

At the same time, however, the Legislature amended Education Code section 35145 (Stats. 1986, ch. 641, § 2), and thereby eliminated any suggestion that there must be an "agenda" for a special meeting of a school board.[11] Rather, by simultaneously amending Education Code section 35144 and section 54956 (Stats. 1986, ch. 641, §§ 1, 7), the Legislature declared that both school boards and any other "legislative body" of a local agency may proceed in a "special meeting" after posting a "call and notice" at least 24 hours prior to the special meeting. (Ed. Code, § 35144; § 54956) Of course, special meetings must be open and public, and the school board/legislative body may not consider any business other than that which is specified in the posted "notice." (Ed. Code, § 35145; § 54953, subd. (a).)[12] The 1986 amendments do not expressly provide for public input into either the "notice" for a special meeting, or the meeting itself.

softened their position somewhat, arguing that the 1986 amendments "qualify and clarify" Education Code section 35145.5.

[11]Before it was amended in 1986 (Stats. 1986, ch. 641, § 2), Education Code section 35145, subdivision (b) provided, inter alia, that "A list of items on which action may be taken that will constitute the agenda" had to be posted in a place where parents and teachers may view same, "in the case of special meetings, at least 24 hours prior to said special meeting."

[12]Although the Education and Government Codes have consistently provided that the presiding officer, or a majority of the members of local "legislative body," may call a special meeting, neither before nor after the 1986 amendments to the Education and Government Codes has there been any legislative guidance as to the *purposes* for which a special meeting may be called. The most obvious reason for such meetings might be that time-sensitive issues arise that must be addressed before the next regularly scheduled meeting, which may be held either monthly or quarterly. (Ed. Code, § 35141.) However, use of "special meetings" to evade the agenda and public participation requirements that apply to "regular meetings"

■ It appears, therefore, that the Legislature has eliminated any right members of the public may have had before the 1986 amendments to place items on the agenda of, and to address, special meetings of a school board. There remains, however, the requirement that members of the public have a right to place items on the agenda for all *regular* meetings of school boards that may well be broader than for regular meetings of other local legislative bodies. (See Ed. Code, § 35145.5.) Indeed, school boards are required to "adopt reasonable regulations *to insure*" that this right is protected, subject only to the limitation that the regulations may "specify reasonable procedures to insure the proper functioning of governing board meetings." (*Ibid.*, italics added.) It also appears that, at regular meetings, school boards must allow members of the public to directly address "any item of interest to the public . . . that is within the subject matter jurisdiction" of the school board, whether or not that item has previously been placed on the agenda.[13]

In this case, appellants clearly alleged in their second amended complaint that the March 15 meeting was a "special meeting." Given the 1986 amendments to the open meeting laws, appellants' fourth and fifth causes of action for violation of Education Code section 35145.5 were appropriately dismissed.

   2. *Whether Appellants Sufficiently Alleged That the Hearing and Review Committees Were Subject to, and Violated, the Brown Act.*

■ In their sixth and seventh causes of action, appellants alleged that the review and hearing committees were "advisory committees" which are subject to the Brown Act pursuant to section 54952.3. Appellants further alleged that these committees violated the Brown Act by secretly reviewing, investigating, and deliberating about parental complaints regarding the Impressions series and, again, sought declaratory and mandamus relief against respondents. The superior court sustained the demurrer to these causes of action, citing the general discussion of "legislative bodies" under section 54952 found in *Yoffie* v. *Marin Hospital Dist.* (1987) 193 Cal.App.3d 743 [238 Cal.Rptr. 502]. While we disagree with the trial court's conclusion on this issue, we recognize that it is a close question of statutory interpretation.

(Ed. Code, §§ 35145, 35145.5; §§ 54954.2, 54954.3) may well violate state open meeting laws. (See *Joiner* v. *City of Sebastopol* (1981) 125 Cal.App.3d 799, 805, fn. 5 [178 Cal.Rptr. 299]; *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.*, *supra*, 263 Cal.App.2d 41, 50 [open meeting statutes may "push beyond debatable limits in order to block evasive techniques"]; see also § 54954.4, subd. (c) ["complete, faithful, and uninterrupted compliance with the Ralph M. Brown Act . . . is a matter of overriding public importance"].)

[13]Since 1991, moreover, the Legislature has decreed that local legislative bodies, including school boards, must allow the public to address the body "before or during the legislative body's consideration of the item." (Stats. 1991, ch. 66, § 1.)

Appellants specifically alleged that the review and hearing committees were "created by the GOVERNING BOARD under BOARD Policy 7138 and exercised authority delegated by the BOARD under that policy" and were, thus, "advisory committees" within the meaning of section 54952.3. Appellants argue that establishment of the committees pursuant to the Board Policy was sufficient to meet the requirement of section 54952.3 that an advisory committee be "created by charter, ordinance, resolution, or by any *similar formal action* of a legislative body . . . of a local agency." (Italics added.)

Respondents do not deny that the committees were formed under the general authority of Board Policy 7138 but, rather, argue that creation pursuant to the Policy was not sufficient "formal action" within the meaning of section 54952.3. Respondents also appear to argue that section 54952.3 requires appellants to allege (and prove) that the Board itself *appointed* the members of the committees to fall within section 54952.3. definition of "legislative body." We do not believe that section 54952.3 contains such a requirement.

The issue under section 54952.3 is whether the Board "created" the advisory committee by some type of "formal action." We think the focus of our inquiry should first be on the *authority* under which the advisory committee was created. In this case, we believe that authority originates with the Board and not, as respondents imply, with the Superintendent.[14] The next question is whether creation of the Committee pursuant to a standing policy is sufficient to constitute "formal action" within the meaning of section 54952.3. We believe that it is. The Brown Act applies to a wide variety of boards, councils, commissions, committees and other multimember "legislative" bodies that govern California's cities, counties, school districts, and other local public agencies. (See §§ 54951, 54951.1, 54952, 54952.2, 54952.5.) Section 54952.3 clearly contemplates that many of these bodies will establish "advisory committees" to assist with "examination of facts and data," and that the mechanisms by which such advisory bodies are created will be equally varied. We must give that section a broad construction to prevent evasion. (*Joiner* v. *City of Sebastopol, supra,* 125 Cal.App.3d at p. 805, fn. 5.)

---

[14]Respondents encourage this court to look outside the pleadings to evidence that the Superintendent appointed the members of the review and hearing committees. We decline to do so for purposes of our review of the trial court's rulings on the demurrer. However, we note, in passing, that it is irrelevant whether it was the Board or the Superintendent who made the actual appointments. The Superintendent operates at all times under the control of the governing board, and does not exercise independent powers of the type contemplated by section 54952.3. (See *Main* v. *Claremont Unified School Dist.* (1958) 161 Cal.App.2d 189, 204 [326 P.2d 573], disapproved in part on other grounds, *Barthuli* v. *Board of Trustees* (1977) 19 Cal.3d 717, 722 [139 Cal.Rptr. 627, 566 P.2d 261].)

We believe that adoption of a formal, written policy calling for appointment of a committee to advise the Superintendent and, in turn, the Board (with whom rests the final decision), whenever there is a request for reconsideration of "controversial reading matter" is sufficiently similar to the types of "formal action" listed in section 54952.3. Accordingly, allegations that the review and hearing committee were created pursuant to Board Policy 7138 were sufficient to bring those advisory bodies within the coverage of the Brown Act, and allegations that members of the public (appellants) were excluded from the meetings of these bodies were sufficient to state a cause of action for violation of section 54953.[15]

B. *Whether Substantial Evidence Supports the Trial Court's Ruling That the Board Did Not Violate Education Code Section 60262, or Its Own Policy 7135 in Selecting the "Impressions" Materials in 1989.*

█ Appellants raise several claims of error in the superior court's determination of the issues presented for decision during the June 13, 1991, "trial" of the four causes of action remaining in their fourth amended petition.[16] The first set of such issues arises out of the process by which the District originally selected the Impressions materials in 1988 and 1989. In their first cause of action, appellants asserted that the District violated Education Code section 60262, which directs the Board to "promote the involvement of parents and other members of the community in the selection of instructional materials," and Board Policy 7135, which requires the Superintendent to "insure adequate opportunity for teachers, parents and other community members to be involved in the process of recommending instructional materials for purchase by the District." We believe the record amply supports the trial court's findings and conclusions on this cause of action.

As described in part I, above, District parents had notice and ample time to comment on, endorse, or object to the six sets of textbooks that were in

---

[15]Although appellants expressly disclaim reliance on section 54952.2, we believe that section provides an alternate basis for our conclusion that the review and hearing committees were subject to the Brown Act. Allegations and exhibits to the second amended petition were sufficient to bring the committees within the section 54952.2 definition of "legislative body," which includes a committee that exercises authority delegated to it by the legislative body of the local agency.

[16]We agree with respondents that appellants waived their objections to any irregularities in the trial procedures by agreeing to go forward on June 13, 1991, and rejecting the court's offers to continue the proceedings to allow appellants to prepare a response to respondents' declarations. This waiver does not extend to proper evidentiary objections made by appellants during trial.

use in pilot classrooms during the 1988-1989 school year and on display in District offices for several weeks in the spring of 1989. There was also admissible, uncontradicted evidence that the District took affirmative steps to encourage parental involvement in the LATF and the selection process.[17] The fact that no nonstaff parents availed themselves of the opportunities to provide input for the textbook selection process—or to voice any objections to the series that was ultimately adopted—cannot be blamed on the District. Accordingly, we affirm the trial court judgment on the first cause of action in appellants' fourth amended petition.

C. *Whether the Trial Court Erred in Ruling That the Governing Board Did Not Violate the Brown Act or the Education Code in Its Handling of the 1990 "Impressions" Controversy.*

Appellants next assert that there was not substantial evidence to support the trial court's determination that there were no violations of the Brown Act in the District's handling of the 1990 Impressions controversy. Appellants first argue that the trial court erred in concluding that the Board did not violate the open meeting laws by reviewing secret memoranda and informational materials that were presented to its members by the Superintendent and his staff during the investigation of the parents' complaints. Appellants further argue that the trial court erred in concluding that the joint meeting of the Board and the curriculum council to view the "Holy Wars" videotape on February 28, 1990, did not violate the Brown Act. Both of these issues turn on whether there occurred a "meeting" within the meaning of the Brown Act, under which members of the public must be given notice, allowed to attend and (depending on the type of meeting) allowed to participate, unless a specific statutory exception to the open meeting laws is available. (§§ 54950, 54953, 54954.1-54954.3, 54956.)

It is now well settled that the term "meeting," as used in the Brown Act (§§ 54950, 54953), is not limited to gatherings at which action is taken by the relevant legislative body; "deliberative gatherings" are included as well. (*Sacramento Newspaper Guild, supra,* 263 Cal.App.2d at p. 48.) Deliberation in this context connotes not only collective decisionmaking, but also "the collective acquisition and exchange of facts preliminary to the ultimate decision." (*Id.,* at pp. 47-48; *Rowen* v. *Santa Clara Unified School Dist.* (1981) 121 Cal.App.3d 231, 234 [175 Cal.Rptr. 292].)

---

[17]Whereas appellants assert that the Superintendent's appointment of the review and hearing committees pursuant to Board Policy 7138 was sufficient to constitute "formal action" by the Board for purposes of section 54952.3, they argue here that the Superintendent's and District staff's efforts to encourage parental involvement in the LATF was *in*sufficient to satisfy *the Board's* duty to "promote the involvement of parents . . . in selecting instructional materials" for purposes of Education Code section 60262. They cannot have it both ways.

As the court in *Sacramento Newspaper Guild, supra,* explained, "Section 54950 is a deliberate and palpable expression of the act's intended impact. It declares the law's intent that deliberation as well as action occur openly and publicly. Recognition of deliberation and action as dual components of the collective decision-making process brings awareness that the meeting concept cannot be split off and confined to one component only, but rather comprehends both and either." (263 Cal.App.2d at p. 47.) The court further explained that the term "meeting" must be construed expansively to prevent local legislative bodies from evading the requirements of the Brown Act: "In this area of regulation, as well as others, a statute may push beyond debatable limits in order to block evasive techniques. An informal conference or caucus permits crystallization of secret decisions to a point just short of ceremonial acceptance. There is rarely any purpose to a nonpublic pre-meeting conference except to conduct some part of the decisional process behind closed doors. Only by embracing the collective inquiry and discussion stages, as well as the ultimate step of official action, can an open meeting regulation frustrate these evasive devices." (*Id.,* at pp. 49-50, fn. omitted.)

Thus, an informal luncheon, at which a quorum of the legislative body is present and the public's business is discussed, is a "meeting" within the meaning of the Brown Act. (*Sacramento Newspaper Guild, supra,* 263 Cal.App.2d at pp. 46-48.) Similarly, a session in which a school board gathers information from prospective contractors about their qualifications to perform services for the school district is a "meeting" subject to Brown Act requirements, even though no commitment is made to retain the persons interviewed. (*Rowen, supra,* 121 Cal.App.3d at pp. 233-234.) To prevent subterfuge, moreover, a series of telephone calls by which the members of a legislative body commit themselves to a decision concerning public business, has also been held to be a "meeting" for purposes of the Brown Act. (*Stockton Newspapers, Inc., supra,* 171 Cal.App.3d at pp. 102-103.)

The February 28, 1990, gathering of a quorum of the Board and various members of the curriculum council falls well within the definition of "meeting" as developed by the foregoing case law. In their declarations, the three Board members who attended that meeting admitted that they were all present for approximately one hour of discussion about "district goals and objectives" that plainly occurred between and among the declarants and the members of the curriculum council. The three Board members also admitted that they jointly viewed the "Holy Wars" video, which was described in the minutes as a "censorship film." It is irrelevant that the declarants deny, in

unison, that they participated in or heard any discussion about the videotape or the Impressions series.[18]

What is relevant to the "meeting" issue is that the Board members who were present constituted a quorum, that they participated in discussions relating to District business, and that they were undeniably engaged in "collective acquisition and exchange of facts" relating to decisions they were charged with making in the course of their official duties, including the decision they were to make about the pending curriculum controversy. Even if there was no mention of the Impressions series per se, and no discussion after the videotape was shown, the viewing of the "censorship film" by the three Board members was itself an act of collective acquisition of information relating to the pending dispute.

Respondents' analogy to a situation in which Board members attend a District football game or school play is not apt. There is no evidence that the purpose of the February 28 gathering was purely social, or that the Board members attended as mere spectators to the event. Indeed, there is uncontradicted evidence that, at a minimum, the Board members actively participated in discussion of "district goals and objectives."

Respondents also argue that some sort of "collective agreement or commitment" must occur at a deliberative gathering to bring it within the "meeting" concept. This cannot be, and is not, the law. (*Sacramento Newspaper Guild, supra,* 263 Cal.App.2d at p. 48 ["deliberative gatherings are

---

[18]The attendees included both a quorum of the Board and several members of the recently appointed review and hearing committees, and the *only* agenda item for which the minutes of the February 28 meeting reflect any discussion was "recent complaints received about our adopted language arts series." Given these facts, it is, frankly, incredible that the District asserts that there was no discussion about the Impressions controversy. Indeed, Board member Lisa Seifert admitted in her deposition that she *did* hear some discussion about the Impressions controversy. The Superintendent also admitted that the February 28 meeting of the curriculum council and Board members was intended to "bring them up to date" about the review process for the parents' complaints. There are additional reasons to doubt the Board members' declaration testimony on this point: The uniform times of arrival ("about 8:30 AM, after the meeting had begun") and departure ("immediately" after the videotape ended) flatly contradict all other documentary evidence about the meeting times. Also, Board member Patty DeTar's deposition testimony about her time of arrival (10 a.m.) and departure (11:30 a.m.) is consistent with the documentary evidence about the meeting, but squarely contradicted by her later declaration. Because of these discrepancies between the declarations and other more reliable evidence, including deposition testimony, the trial court would have been fully justified in rejecting the Seifert, DeTar, and O'Neill declarations. (See *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 22 [112 Cal.Rptr. 786, 520 P.2d 10].) In light of our ruling that the precise topics of discussion at the February 28 meeting were irrelevant to the determination of the "meeting" issue, however, we need not decide whether the trial court erred in admitting these declarations.

'meetings,' however confined to investigation and discussion"]; *Rowen, supra,* 121 Cal.App.3d at pp. 233-234 [gathering to discuss qualifications of prospective consultants was a Brown Act "meeting" notwithstanding the fact that no commitment was made about retaining them]; 42 Ops.Cal.Atty.Gen. 61 (1963) [Brown Act applies to "briefing sessions" by which employees of local agency simply provide information to a gathering of members of the legislative body].) It is true, as described above, that ". . . the Brown Act comprehends informal sessions at which a legislative body commits itself collectively to a particular future decision concerning public business." (*Stockton Newspapers, Inc., supra,* 171 Cal.App.3d at p. 102.) That language does not, however, describe the entire universe of gatherings subject to the Brown Act. If it did, a legislative body would be able to conduct most—if not all—of its deliberative functions behind closed doors, so long as it never reached agreement, or agreed *not* to agree. We reject respondents' narrow interpretation of the term "meeting" as applied to the February 28, 1990, meeting. (*Sacramento Newspaper Guild, supra,* 263 Cal.App.2d at pp. 49-50.)

On the other hand, we do not believe that the one-way transmission to and solitary review by Board members of background materials relating to the Impressions controversy is within the ambit of the open meeting laws. Unlike the "serial" meetings at issue in *Stockton Newspapers, Inc., supra,* the transmission of informational materials in this case undisputedly involved no interaction or communication between or among individual Board members, either directly or through the agency of District staff. (171 Cal.App.3d at p. 102.)

The California Supreme Court has recently addressed a similar issue. (*Roberts* v. *City of Palmdale* (1993) 5 Cal.4th 363, 373-377 [20 Cal.Rptr.2d 330, 853 P.2d 496].) In that case, a resident and taxpayer of the City of Palmdale alleged that distribution of a confidential legal opinion of the city attorney to individual members of the city council, in preparation for a public hearing on a real estate development, was a "closed-session meeting" of the city council which violated the Brown Act. (§ 54956.9.) The Court of Appeal agreed with the taxpayer that the city council had violated section 54956.9 in that the "meeting" was commenced without an appropriate public announcement. However, after reviewing the history of the Brown Act, its interpretation in the courts, and the plain meaning of the language of the statute, the Supreme Court reversed, holding that ". . . section 54956.9 was intended to apply to *collective* action of local governing boards and not to the passive receipt by individuals of their mail." (5 Cal.4th at p. 376, italics added.) Because the record did not disclose any serial communications among members of the city council, or any other type of "collective

deliberation" about the city attorney's letter, the court concluded that there had been no "meeting" within the meaning of the Brown Act. (*Id.*, at pp. 376-377.)

The same is true here. Appellants presented no evidence of any type of "collective deliberation" by Board members regarding the memoranda about the Impressions controversy. Rather, appellants alleged nothing more than "passive receipt by individuals of their mail." (*Roberts, supra,* 5 Cal.4th at p. 376.) Thus, the trial court was correct in ruling that distribution of memoranda from District staff to individual members of the Board was not subject to the open meeting requirements of the Brown Act.[19]

Nevertheless, we agree with appellants that the trial court committed reversible error when it ruled that the closed meeting of the Board on February 28, 1990, did not violate the Brown Act. We also agree that the District's persistent denials that such a gathering was a "meeting" subject to the Brown Act warrants declaratory relief in favor of appellants. (See *Common Cause* v. *Stirling* (1983) 147 Cal.App.3d 518, 523-524 [195 Cal.Rptr. 163].) Accordingly, we reverse the trial court's judgment on the second and third causes of action in the fourth amended petition, and remand for entry of an appropriate declaratory judgment consistent with this opinion.

D. *Whether the Decision Confirming the Adoption of the "Impressions" Series Must Be Set Aside Because of the Brown Act Violations in This Case.*

Having decided that the District committed certain violations of the Brown Act, which we believe are appropriately the subject of declaratory relief in this case, we turn to the further question of whether the decision of the Board confirming the decision to adopt the Impressions series must be set aside because of those violations. We believe that this issue is best entrusted to the superior court for determination following a new hearing.

---

[19]This is not to say that we condone what appear to have been attempts by District staff to conceal the fact of these communications from members of the public, other than those who were invited to serve on the review and hearing committees, by labelling the materials for "Your Eyes Only." The challenged materials were undisputedly writings that were distributed to a majority of Board members, and related to matters to be discussed and/or considered at meetings that were—or should have been—public meetings. Unlike the city attorney's letter in *Roberts, supra,* there was no claim of privilege as to the materials distributed by the Superintendent and his staff. (5 Cal.4th at pp. 369-373.) Thus, it appears that these documents were subject to public disclosure *upon request,* in advance of any meeting to which they pertained (§ 54957.5), notwithstanding the District's attempts to keep them secret. However, there is no indication that appellants made a request for the challenged materials in advance of any of the meetings about the Impressions series, nor that they were denied copies when they were ultimately requested.

The trial court will have to consider the effect of our reinstatement of the sixth and seventh causes of action from the second amended complaint. Before deciding whether to issue a writ of mandamus pursuant to section 54960.1, moreover, the trial court will need to make additional findings as to appellants' compliance with the demand procedures provided in that section. (*Id.*, at subd. (b).) The court should also consider, in the first instance, whether any "action taken" in violation of the Brown Act in this case was "cured or corrected" by subsequent action of the Board, including the holding of public meetings on March 1 and April 5, 1990, at which both sides of the Impressions controversy were allowed to air their views for consideration by the Board. (*Id.*, at subd. (d).)

E. *Whether the Trial Court Erred in Ruling That There Was No Violation of Appellants' Constitutional Rights in the Proceedings Below.*

Appellants' constitutional claims appear to be of two types. First, they appear to assert that the District's conduct in violation of the Brown Act also constituted a denial of due process. There is no legal basis for appellants' due process claim absent proof that they were deprived of some protected property interest. (See *Public Utilities Comm.* v. *U.S.* (9th Cir. 1966) 356 F.2d 236, 240-242.)

Appellants' second theory of viewpoint discrimination, in violation of their equal protection, free speech, and petition rights, fares no better. Clearly, there is substantial evidence to support the trial court's conclusions that appellants had ample opportunity to present their views on the Impressions materials, and that appellants and the pro-Impressions parents were treated in a substantially equal manner by the District. It is only by distorting the record evidence beyond recognition that appellants can argue that the pro-Impressions parents "worked with" and were supported by the review committee. The mere fact that the two pro-Impressions parents made their presentation to the hearing committee during the time allotted to the review committee does not establish that they received more favorable treatment at the hands of the District because of the content of their expression. Indeed, the pro-Impressions parents were allowed only a few minutes to speak to the hearing committee, whereas appellants were given an hour and a half to present their case.[20] We affirm the trial court ruling on appellants' fourth cause of action.

[20]Appellants make much of the fact that Ms. Frazer was rejected in attempts to win appointment to the review committee. Beyond the fact that she was, thus, unable to attend the closed meetings of the committee, we do not find any indication in the record that this statutory violation in any way impaired Ms. Frazer's ability to communicate her views about the Impressions series to the District. It is apparent from the record that she had multiple

F. *Whether the Trial Court Erred in Awarding Costs to Respondents.*

Appellants' final contention is that the trial court erred in entering a cost award in favor of respondents. A defendant local agency may recover court costs (and reasonable attorney fees) in a Brown Act case when (1) the agency has prevailed in a final determination of the action, and (2) the court finds that the action was "clearly frivolous and totally lacking in merit." (§ 54960.5.) The trial court made no finding on the issue of frivolousness of appellants' action before entering a cost award in favor of respondents. In light of our conclusions on the Brown Act issues presented in this appeal, we do not believe that appellants' action was "frivolous" so as to warrant an award of costs to respondent. Indeed, we have concluded that there were violations of the Brown Act in the District's handling of the 1990 "Impressions" controversy. Accordingly, we vacate the award of costs to respondents.

Appellants take this issue one step further, however, and ask this court to award *them* costs and attorney fees in this action if the court finds any violations of the Brown Act. An award of costs and fees to the plaintiff in an action pursuant to section 54960 or 54960.1 is not mandatory, but rather a matter entrusted to the sound discretion of the trial court. (§ 54960.5; *Common Cause* v. *Stirling, supra,* 147 Cal.App.3d at pp. 520-521.) Unlike the court in *Common Cause,* we do not have the benefit of a stipulated set of facts, or the trial court's wisdom on the issue whether appellant should recover its fees and costs and, if so, in what amount(s). Accordingly, we decline appellants' invitation to decide this issue in the first instance, and remand for an exercise of the trial court's discretion in light of our discussion of the Brown Act.

### III. CONCLUSION

The judgment of the trial court as to the first and fourth causes of action in appellants' fourth amended petition is affirmed. As to the third cause of action, we reverse and remand for entry of an appropriate declaratory judgment as to the Brown Act violations we have identified. As to the second cause of action, by which appellants apparently seek a writ of mandamus pursuant to section 54960.1, we reverse and remand for a new hearing including a determination whether (1) appellants sought relief within

opportunities to and, in fact, did address the Board, the hearing committee, and District staff at public and private meetings, by letter, and by telephone.

the time limits stated in subdivision (b) of that section; and (2) whether the public meetings of the Board in March and April 1990 "cured and corrected" the previous violations of the Brown Act, eliminating any resulting prejudice to appellants, as provided in subdivision (d).

Kline, P. J., and Smith, J., concurred.

A petition for a rehearing was denied October 1, 1993, and respondents' petition for review by the Supreme Court was denied November 17, 1993.