101 Cal.Rptr.2d 867 (2000)
85 Cal.App.4th 152
Aaron EPSTEIN, Plaintiff and Appellant,
v.
HOLLYWOOD ENTERTAINMENT DISTRICT II BUSINESS IMPROVEMENT DISTRICT et al., Defendants and Respondents.
No. B134256.
Court of Appeal, Second District, Division Three.
November 30, 2000.
Rehearing Granted January 2, 2001.
*868 Moskowitz, Brestoff, Winston & Blinderman, Dennis A. Winston and Barbara S. Blinderman, Los Angeles, for Plaintiff and Appellant.
Sheppard, Mullin, Richter & Hampton and Andre J. Cronthall, Los Angeles, for Defendants and Respondents Hollywood Entertainment District Number Two Business Improvement District and Hollywood Entertainment District Property Owners Association.
James K. Hahn, City Attorney, Patricia V. Tubert, Senior Assistant City Attorney and Kenneth Cirlin, Assistant City Attorney for Defendant and Respondent City of Los Angeles.
CROSKEY, J.
The Hollywood Entertainment District II Business Improvement District (BID II) is a special assessment district in the City of Los Angeles (City). The Hollywood Entertainment District Property Owners Association (the POA), a title 26, United States Code section 501(c)(6) nonprofit corporation, administers the funds City raises through assessments on businesses within BID IPs boundaries.[1] The money is used to contract for such things as security patrols, maintenance, street and alley cleaning, and a newsletter.
Aaron Epstein (plaintiff), who owns property zoned for business purposes within BID II, sued defendants to establish that the POA was required to comply with the Ralph M. Brown Act (the Brown Act or the Act) (Gov.Code, § 54950 et seq.)[2] by holding noticed, open meetings and posting its agenda in advance. His motion for a preliminary injunction was denied after the superior court concluded that the *869 Brown Act did not apply because (1) the POA had not been created by City, and (2) the POA had pre-existed the creation of BID II by at least two years.
Plaintiff filed timely notice of appeal. We reverse. The facts of this case come within the parameters of our holding in International Longshoremen's & Warehousemen's Union v. Los Angeles Export Terminal, Inc. (1999) 69 Cal.App.4th 287, 81 Cal.Rptr.2d 456 (International Longshoremen's), because City "played a role in bringing" the POA "into existence." The POA was not simply a pre-existing corporation which just "happened" to be available to administer the funds for BID II. Instead, the record indicates that the POA was formed and structured in such a way as to take over administrative functions that normally would be handled by City.

FACTUAL AND PROCEDURAL BACKGROUND[3]
The Property and Business Improvement District Law of 1994 (Sts. & Hy. Code, §§ 36600 et seq.) authorizes cities to establish property and business improvement districts (BIDs) in order to levy assessments on real property for certain purposes. Those purposes include acquiring, constructing, installing, or maintaining improvements (Sts. & Hy.Code, § 36606), which include such things as parks, street changes, ramps, sidewalks and pedestrian malls. (Sts. & Hy.Code, § 36610, subds. (f), (i), and (k).) A prerequisite to the creation of such a BID is a petition filed by property owners who will pay more than 50 percent of the total amount of assessments to be levied. (Sts. & Hy.Code, § 36621, subd. (a).)
On September 3, 1996, City adopted Ordinance No. 171273 (the first Ordinance) to create the Hollywood Entertainment District Business Improvement District (BID I). The first Ordinance incorporated by reference a "Management District Plan" which contained information required by Streets and Highways Code section 36622.[4] The Management District Plan included a "Proposed Annual Program" which included security, maintenance, marketing, streetscape and administration components. It also included a section on "Governance," which provided, in relevant part, "The Property and Business Improvement District programs will be governed by a non-profit association. Following is a partial summary of the management and operation of the proposed association." (Italics added.) The section on Governance made it clear that the non-profit association, which would govern BID I, was not yet in existence.[5]
Articles of incorporation of the Hollywood Property Owners Association (the POA), the non-profit association that did take over governance of BID I, were filed with the California Secretary of State on September 25, 1996. These articles of incorporation were dated September 5, 1996. The POA was a nonprofit mutual benefit corporation, whose specific and primary purpose was "to develop and restore the public areas of the historic core of Hollywood, California, in order to make it a more attractive and popular destination for tourists, shoppers, businesspeople and persons interested in culture and the arts."
*870 On August 18, 1998, City adopted Ordinance No. 172190 (the second Ordinance) to create Hollywood Entertainment District II Business Improvement District (BID II). The second Ordinance incorporated by reference a "Management District Plan" which contained information required by Streets and Highways Code section 36622. The Management District Plan for BID II, which was entitled "Hollywood Entertainment District Property Business Improvement District Phase II," included a copy of the petition used to form BID II, which referred to BID II as an "extension" of BID I. In fact, a comparison of the map of the proposed boundaries of BID II with the map of the proposed boundaries of BID I shows that BID II simply added approximately another 10 blocks down Hollywood Boulevard to the approximately five blocks down the length of the boulevard already covered by BID I.
The Management District Plan for BID II also included a "Program and Budget" which included security, maintenance, marketing and promotion, and administration components. It also included a section on "Governance," which provided, in relevant part, "The Property and Business Improvement District programs will be governed by the Hollywood Entertainment District Property Owners Association, a 501(c)(6) non-profit corporation which was formed in 1996 to govern Phase I. Following is a summary of the management and operation of the Association as it relates to Phase II." (Italics added.) In addition, unlike the Management District Plan for BID I, the Management District Plan for BID II included the "Amended and Restated Bylaws" of the POAwhich were quite detailed.
The POA's monthly meetings were not open to the public, much to the distress of plaintiff, who owns property subject to assessment in favor of BID II. Furthermore, according to plaintiff, the POA's bylaws allow it to do other things which would be prohibited by the Brown Act if it were applicable to the POA, for example, the by-laws allow meetings to take place anywhere, not solely within the POA's jurisdiction, and to take place without posting notice 72 hours in advance.
Accordingly, on March 18, 1999, plaintiff filed a complaint for declaratory and injunctive relief against defendants, seeking, among other things, a declaration that the Brown Act does apply to the POA and that, in fact, the POA's meetings are required to be open and noticed as required by the Brown Act, and that any contracts let by the POA must comply with the competitive bidding requirements of City's charter. He moved for a preliminary injunction, which the superior court denied, on the ground that because the POA was not created by City, and because it preexisted the creation of BID II by at least two years, the Brown Act did not apply. The order denying the motion was filed on June 11, 1999, and on August 4, 1999, plaintiff filed notice of appeal.

CONTENTIONS ON APPEAL
Plaintiff contends that the trial court erred by concluding that the POA was not a legislative body under the Brown Act. He further contends that because the POA is a legislative body within the meaning of the Act, and can only exercise the powers that City could delegate to it, it cannot enter into contracts without complying with the City Charter's requirement of competitive bidding. Finally, he contends the trial court erred by denying him injunctive relief against the POA. Defendants dispute these contentions.

DISCUSSION

1. Public Policy Favors Conducting the Public's Business in Open Meetings

It is clearly the public policy of this State that the proceedings of public agencies, and the conduct of the public's business, shall take place at open meetings, and that the deliberative process by which decisions related to the public's business *871 are made shall be conducted in full view of the public. This policy is expressed in (1) the Bagley-Keene Open Meeting Act (§§ 11120 et seq.), which applies to certain enumerated "state bodies" (§§ 11121, 11121.2), (2) the Grunsky-Burton Open Meeting Act (§§ 9027-9032), which applies to state agencies provided for in Article IV of the California Constitution, and (3) the Ralph M. Brown Act (§§ 54950 et seq.), which applies to districts or other local agencies, including cities. Under these various laws related to open meetings, a wide variety of even the most arcane entities must give notice of their meetings, and make such meetings open to the public.[6]

2. The Purpose Behind the Brown Act

The Brown Act, the open meeting law applicable here, is intended to ensure the public's right to attend the meetings of public agencies. (Freedom Newspapers, Inc. v. Orange County Employees Retirement System (1993) 6 Cal.4th 821, 825, 25 Cal.Rptr.2d 148, 863 P.2d 218; International Longshoremen's, supra, 69 Cal.App.4th at p. 293, 81 Cal. Rptr.2d 456.)[7] To achieve this aim, the Act requires, inter alia, that an agenda be posted at least 72 hours before a regular meeting and forbids action on any item not on that agenda. (§ 54954.2, subd. (a); International Longshoremen's, supra, 69 Cal.App.4th at p. 293, 81 Cal.Rptr.2d 456.) The Act thus serves to facilitate public participation in all phases of local government decisionmaking and to curb misuse of the democratic process by secret legislation of public bodies. (International Longshoremen's, supra, 69 Cal.App.4th at p. 293, 81 Cal.Rptr.2d 456.)
The Brown Act specifically dictates that "[a]ll meetings of the legislative body of a local agency shall be open and public, and all persons shall be permitted to attend any meeting of the legislative body of a local agency, except as otherwise provided in this chapter." (§ 54953, subd. (a), italics added.) The term "legislative body" has numerous definitions, grouped together in section 54952. The definition which arguably may apply to the POA is found in subdivision (c)(1)(A) of section 54952. This portion of the Brown Act states, in relevant part: "As used in this chapter, `legislative body' means: [¶] ... [¶] (c)(1) A board, commission, committee, or other multimember body that governs a private corporation or entity that ...: [¶] (A) Is created by the elected legislative body in order to exercise authority that may lawfully *872 be delegated by the elected governing body to a private corporation or entity." (§ 54952, subd. (c)(1)(A), italics added.) Thus, the question before us here, as a matter of law, is whether the POA's board of directors is a legislative body within the meaning of this subdivision because the POA was created by City in order to exercise delegated governmental authority.
In answering this question, we are mindful, as we noted in International Longshoremen's, that the Brown Act is a remedial statute, that must be construed liberally as to accomplish its purpose. (International Longshoremen's, supra, 69 Cal.App.4th at p. 294, 81 Cal.Rptr.2d 456; see People ex rel. Lungren v. Superior Court (1996) 14 Cal.4th 294, 313, 58 Cal. Rptr.2d 855, 926 P.2d 1042 ["civil statutes for the protection of the public are, generally, broadly construed in favor of that protective purpose. [Citations.].)

3. The POA's Board of Directors Is a Legislative body Within The Meaning of the Brown Act

Here, just as in International Longshoremen's, the pivotal issue is whether City, an elected legislative body, "created" the POA in order to exercise authority that City could lawfully delegate. Therefore, we discuss in some detail the facts of International Longshoreman's.
In the International Longshoremen's case, the Los Angeles Export Terminal, Inc. (LAXT) was a private, for-profit corporation organized to design, construct and operate a facility for the export of coal. The facility would be on land leased from the Harbor Department of the City of Los Angeles, and the Harbor Department was to be a fifteen-percent shareholder in LAXT. The shareholders' agreement by which LAXT was set up gave the Harbor Department the right to appoint three of LAXT's nineteen board members, plus veto power over the coal facility project. The lease of the Harbor Department's land was also something that had to be, and was, approved by the City Council.
Thereafter, LAXT's board of directors authorized LAXT to enter into a terminal operating agreement with Pacific Carbon Services Corporation (PCS). This decision was made at a meeting that did not comply with the requirements of the Brown Act. The International Longshoremen's & Warehousemen's Union (ILWU) sued to nullify the agreement with PCS, and for an injunction, contending that LAXT was required to comply with the Brown Act.
The trial court agreed with the union, nullified the PCS agreement, and enjoined LAXT from making decisions without complying with the Brown Act. It reached this result because it concluded that LAXT's board of directors was a legislative body within the meaning of the Brown Act. LAXT appealed, and argued, among other things, that it had not been created by the City Council (a legislative body), but only by the Harbor Commission (an appointed body), and hence the Brown Act, by its terms, did not apply.
We disagreed. Although section 54952, subdivision (c)(1)(A), did not, and does not, define what is meant by the term "created by," we relied on the ordinary definition of "to create," which is "to bring into existence." (International Longshoremen's, supra, 69 Cal.App.4th at p. 295, 81 Cal. Rptr.2d 456, quoting Webster's New Internat. Diet. (3d ed.1986) p. 532.) We concluded that the "City Council was involved in bringing LAXT into existence," because it had the ultimate authority to overturn the Harbor Commission's actions, and could have disaffirmed any steps the Harbor Commission took to become part of LAXT. We also concluded that LAXT had been created to exercise governmental authority, to wit, the development and improvement of a city harbor (§ 37386), and that the City Council had delegated its governmental authority as to this aspect of the City's harbor, to LAXT. Therefore, the Brown Act applied to LAXT's meetings.
*873 In the case here, the issue is whether the POA is a private corporation or entity that was created by City, the elected legislative body, to exercise some authority that City could lawfully delegate to a private corporation or entity. We conclude that here, just as in International Longshoremen's, the private entity, the POA, was "created" by City to exercise governmental authority over BID I, authority that City otherwise could exercise.
The POA was, in fact, "created" by City, because City "played a role in bringing" the POA "into existence." (International Longshoremen's, supra, 69 Cal.App.4th at p. 295, 81 Cal.Rptr.2d 456.) City specifically provided in the first Ordinance that BID I would be governed by a non-profit association, and even set forth a partial summary of the management and operation of such proposed association. Within days of the adoption of the first Ordinance, the POA's articles of incorporation were prepared, and less than a month later, were filed with the Secretary of State. The POA's sole purpose was to "develop and restore the public areas of the historic core of Hollywood." And it was the POA that did, in fact, take over governance of BID I. Obviously, when City adopted the first Ordinance creating BID I that called for the creation of a non-profit association to govern the BID I programs, the City "played a role in bringing the POA into existence."
Defendants, however, would prefer that we ignore the POA's history vis-à-vis BID I, and concentrate instead on the POA's relationship to BID II. This is because the POA's existence preceded the creation of BID II. Defendants would have us look at the POA as simply a "preexisting corporation" that just "happened" to be available to administer the funds for BID II, apparently in reliance on footnote 5 of International Longshoremen's. In that footnote, we opined that if LAXT, the private corporation in question there, had been a "preexisting" entity "which simply entered into a contractual arrangement" to exercise authority that the government entity could have exercised, then the private entity "would not have been a creation of the City Council" and the private entity's board of directors would not be subject to the Brown Act. (International Longshoremen's, supra, 69 Cal.App.4th at p. 300, fn. 5, 81 Cal.Rptr.2d 456.)
There is no reason to ignore the history behind the POA, and, in fact, because the issue is the "creation" of the entity whose governing board now wields governmental authority, we must look at the circumstances surrounding the POA's birth. The record shows that the POA was formed and structured for the sole purpose of taking over City's administrative functions as to BID I. Therefore, under the Brown Act, as interpreted by us in International Longshoremen's and Warehousemen's Union v. Los Angeles Export Terminal, Inc., supra, 69 Cal.App.4th 287, 81 Cal.Rptr.2d 456, the POA's board of directors, vis-à-vis BID I, was subject to the Brown Act, because the board was a legislative body within the meaning of section 54952(c)(1)(A).
Thereafter, the boundaries of BID I were extended, the new BID was called BID II, and the POA simply continued to administer the assessments collected from property owners in the enlarged District. Obviously, the fact that the POA was already in existence and ready to take over City's legislative functions vis-à-vis BID II cannot change the result we would have reached if this case had been presented after BID I was created and before BID II had come into existence. And the connection between BID I and BID II rationally cannot be ignored in any determination of when and how the POA was "created." City itself, in the Management District Plan for BID II, explicitly recognized that the POA "was formed in 1996 to govern Phase I," that the POA also would govern "Phase II," and that BID II was just an "extension" of BID I.
Under these circumstances, we would improperly elevate form over substance if *874 we were to treat the POA as a "preexisting" private entity with which City just "happened" to decide to do business when it turned governance of BID II over to the POA. To turn a blind eye to such a subterfuge would allow City (and, potentially, other elected legislative bodies in the future) to circumvent the requirements of the Brown Act, a statutory scheme designed to protect the public's interest in open government. This we will not do. (Plumbing, etc., Employers Council v. Quillin (1976) 64 Cal.App.3d 215, 220, 134 Cal.Rptr. 332 [court will not place form above substance if doing so defeats the objective of a statute]; People v. Jackson (1937) 24 Cal.App.2d 182, 192, 74 P.2d 1085, disapproved on another ground, People v. Ashley (1954) 42 Cal.2d 246, 262, 267 P.2d 271 ["It should be and is an established principle of the law that the substance and not the mere form of transactions constitutes the proper test for determining their real character. If this were not true it would be comparatively simple to circumvent by sham the provisions of statutes framed for the protection of the public. This the law does not permit. (Citations.)"]; see also Civ. Code, § 3528 ["The law respects form less than substance"]; People v. Reese (1934) 136 Cal.App. 657, 672, 29 P.2d 450, disapproved on another ground, People v. Ashley, supra, 42 Cal.2d 246, 262, 267 P.2d 271 ["The evidence tends to prove, and the jury had the right to find, that the real intention of the defendants was to place upon the market and sell shares of stock in a corporation, and that the form of the certificates issued by them was a subterfuge adopted in order to defeat the purposes of the Corporate Securities Act. The operation of the law may not thus be circumvented"].)
The POA's status as an entity originally "created" to take over City's legislative functions was not somehow negated, annulled, or dissipated simply because its role subsequently was expanded by the geographic expansion of the area over which it exercised such functions. We therefore conclude that the POA is a legislative body within the meaning of the Brown Act and that the trial erred by denying plaintiff's motion for a preliminary injunction.

DISPOSITION
The judgment is reversed and remanded. The trial court is directed to enter a preliminary injunction in favor of plaintiff in accordance with the views expressed herein. Plaintiff shall recover his costs on appeal.
KLEIN, P.J., and ALDRICH, J., concur.
NOTES
[1] BID II, City and POA may be referred to collectively as defendants in this opinion.
[2] All further statutory references will be to the Government Code, except as otherwise noted.
[3] We recite facts taken from the Clerk's Transcript.
[4] For example, section 36622 requires a map showing each parcel of property within the district, the proposed district name, the improvements and activities proposed for each year of operation, the proposed amount to be spent to accomplish the activities and improvements each year, and the source of funding.
[5] Section 36622 does not require the management district plan to contain information on governance or management. However, a city council may require the management district plan to contain other items not specifically required by the state law. (§ 36622, subd. (l).)
[6] See, e.g., Business and Professions Code section 3325 [meetings of the Hearing Aid Dispensers Advisory Commission must be noticed and open]; Business and Professions Code section 7315 [meetings of the State Board of Barbering and Cosmetology must be noticed and open]; Government Code section 8790.7 [meetings of the California Collider Commission must be noticed and open]; Harbors and Navigation Code section 1153 [meetings of the Board of Pilot Commissioners must be noticed and open] Harbors and Navigation Code section 1202 [meetings for the purpose of investigating pilotage rates shall be noticed and open]; Health and Safety Code section 1179.3, subd. (b) [meetings of the Rural Health Policy Council for comments on projects in rural areas of California must be noticed and open]; Insurance Code section 10089.7, subd. (j) [meetings of the governing board and advisory panel of the California Earthquake Authority must be noticed and open]; Public Resources Code section 33509 [meetings of the governing board of the Coachella Valley Mountain Conservancy must be noticed and open]; Education Code section 51871.4, subd. (g) [meetings of the Commission on Technology in Learning must be noticed and open].
[7] The Brown Act's statement of intent provides: "In enacting this chapter, the Legislature finds and declares that the public commissions, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business. It is the intent of the law that their actions be taken openly and that their deliberations be conducted openly. [¶] The people of this State do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created." (§ 54950.)