[No. A112386. First Dist., Div. One. Oct. 31, 2006.]

J. DENNIS WOLFE, Plaintiff and Appellant, v.
CITY OF FREMONT et al., Defendants and Respondents.

534

COUNSEL

Peter N. Hagberg for Plaintiff and Appellant.

Moscone, Emblidge & Quadra, G. Scott Emblidge and Rachel J. Sater for Defendants and Respondents.

OPINION

MARGULIES, J.—This appeal requires us to construe a provision of the Ralph M. Brown Act (Brown Act) (Gov. Code,[1] § 54950 et seq.) that

---

[1] All statutory references are to the Government Code unless otherwise indicated.

prohibits a majority of the members of a local legislative body, when outside a noticed public meeting, from using "direct communication, personal intermediaries, or technological devices . . . to develop a collective concurrence as to action to be taken on an item." (§ 54952.2, subd. (b).)

The police department of the City of Fremont (City) devised a new policy to govern its response to activated home invasion alarms. Plaintiff J. Dennis Wolfe alleges that, in an effort to preempt any interference by the city council with the department's implementation of the policy, the city manager met individually with council members to explain the new policy, garner their support, and secure their agreement not to take any action with respect to the policy. In addition to these meetings, the council members discussed the policy privately among themselves.

After word of the new policy became public, the city council set the matter for formal discussion at a regular meeting. During that meeting, the city manager is alleged to have acknowledged that he met individually with council members to discuss the new policy. Moreover, one council member is alleged to have stated that council members, after having been briefed on the new policy, had expressed their support for it in advance of the meeting.

Wolfe filed suit against the City, the city manager, the chief of police, and the council members, contending that the activities of the city manager and the city council constituted a violation of the Brown Act's requirement that city council meetings be open and public. The trial court granted defendants' demurrer, concluding that the allegations of the complaint failed to state a claim against any of the defendants. While we affirm the trial court's dismissal of the claims against the city manager and the chief of police, we conclude that Wolfe has stated a claim as to the City and the city council. We reverse and remand for further proceedings as to these defendants.

## I. BACKGROUND

Wolfe is a City resident. His first amended complaint asserted a single claim for declaratory and injunctive relief under the Brown Act against the City, the Fremont City Council and its individual members (collectively City Council), Fred Diaz, the city manager, and Craig Steckler, the City's chief of police.

According to the allegations of the first amended complaint,[2] in November 2004, Steckler devised a new policy to govern the police department's response to residential home invasion alarms (the verified response policy). Under the verified response policy, the department would no longer respond to activated home alarms unless an "acceptable reason" for the alarm was verified by a third party. If the police department implemented the verified response policy, it would necessarily cease enforcement of the City's existing false alarm ordinance.

After Diaz learned of the new policy and expressed his support, he and Steckler decided to ensure that the City Council would not interfere with or delay its implementation. Accordingly, "in order to deter the City Council from taking any action against, or in regard to," the verified response policy, Diaz "met individually and privately with a majority of the members of the City Council to discuss the . . . verified response plan and to obtain, among other things: their support for the plan; their collective concurrence to take no action in regard to the plan; their collective concurrence to take no action in regard to amending the Fremont False Alarm Ordinance . . . or in regard to the nonenforcement of the ordinance." As a result of Diaz's meeting with the council members, Diaz "obtained the support and collective concurrence of a majority of the members of the City Council to support the verified response plan and to take no Council action in regard to [the] plan or in regard to the Fremont False Alarm Ordinance."

When news of the verified response policy became public, it caused some discontent in the community. Through local newspapers, it became known that a group of citizens intended to appear at the February 22, 2005 meeting of the City Council to address the verified response policy during the public oral communications portion of the agenda.[3] Thereafter, "a majority of the defendant City Council members discussed the[se] matters . . . among themselves prior to February 22, 2005." Although the verified response policy was not an agenda item, the City Council arranged for Steckler to speak for 45 minutes on the topic of the new policy before the meeting was opened for general public comment. Steckler's address had been arranged during Diaz's meetings with council members for the purpose of "curb[ing] and counter-[ing] public criticism of the policy that all defendants had agreed to support."

After the February 22 meeting, the City Council placed on the agenda for their March 8 meeting an item entitled, "Alarm Response Policy, Public

[2] On review of a granted demurrer, we are required to accept the truth of the plaintiff's allegations. (*Kearney v. Salomon Smith Barney, Inc.* (2006) 39 Cal.4th 95, 101 [45 Cal.Rptr.3d 730, 137 P.3d 914].) The quotations in this section are from Wolfe's first amended complaint.

[3] Section 54954.3 requires the agenda of every regular meeting of a local legislative body to "provide an opportunity for members of the public to directly address the legislative body on any item of interest to the public."

Comment on the Fremont Police Department Policy of Verified Response to Intrusion Alarms." During the course of that March meeting, Diaz "admitted that after meeting with defendant Steckler and supporting his 'verified response' proposal, Diaz met individually with each of the members of the City Council to provide them information on the 'verified response' proposal and to answer their questions." Councilmember Dominic Dutra then "admitted on the record that [the] Council had been fully briefed on the 'verified response' proposal and had expressed their support before February 22, 2005," when the first meeting occurred. Although the complaint does not specify the ultimate fate of the verified response policy, it appears that the City Council took no action to prevent its implementation.

In addition to these specific allegations, the complaint contains more general allegations of what Wolfe claims to have been unlawful conduct by City officials. He alleged that "there is a common and continuing practice in Fremont city government in which the City Manager meets serially and individually with a majority of members of the City Council to discuss business items that are, will be, or may be on the agendas of upcoming meetings of the City Council" and that "the purposes of the serial meetings . . . are to exchange information, explore viewpoints, reach decisions, and help develop a collective concurrence of a majority of the members of the defendant City Council on how to respond to and deal with issues that come before, or may come before, the defendant Fremont City Council." Wolfe also alleged that City Council closed sessions, ordinarily restricted to the discussion of confidential matters, are used for a similar purpose.[4]

Defendants filed a demurrer and motion to strike regarding the first amended complaint, arguing that (1) any serial meetings of the City Council regarding the new policy did not violate the Brown Act because the City Council had no authority over police department policies, (2) the allegations were improperly vague and conclusory, and (3) Diaz and Steckler were not subject to the Brown Act.

The trial court sustained the demurrer against Diaz and Steckler without leave to amend on the ground that they were not proper parties to a Brown Act claim. Without explanation, the court also sustained the demurrer to the claims against the remaining defendants "with leave to amend, for Plaintiff to allege, if possible, facts demonstrating that these defendants engaged in conduct that violated the Brown Act." When Wolfe failed to file an amended pleading within the time period allotted, the trial court entered judgment in favor of defendants.

---

[4] A local legislative body may meet in nonpublic "closed session" to discuss only a limited range of confidential topics specified in the Brown Act, such as real estate transactions, pending litigation, and personnel issues. (E.g., §§ 54956.8, 54956.9, 54957.)

## II. DISCUSSION

The Brown Act is intended to ensure that the deliberations and actions of the governing bodies of local agencies are open and public and that provision is made for meaningful public access to their decisionmaking. (§ 54950.) To that end, the act requires the meetings of such bodies to be open to the public, held on a regular schedule, and conducted in accordance with an agenda available in advance of the meeting. (§§ 54953, 54954, 54954.2.) Conversely, the act prohibits action on items not placed on the agenda and severely restricts the type of actions such bodies can take in private session. (§§ 54954.2, 54956.7–54957.)

Wolfe contends that the allegations of the first amended complaint demonstrate that council members, through individual, serial discussions with Diaz and among themselves, reached a consensus not to take action with respect to the verified response policy, thereby violating the Brown Act provisions that prohibit the legislative body of a local agency from conducting nonpublic meetings.

### A. *Judicial Interpretation of the Brown Act*

This matter must ultimately be decided by application of the statutory language of the Brown Act. Because the current statutory language was enacted in consideration of a few key judicial decisions construing an earlier version of the act, however, we begin with a review of those decisions.

"It is clearly the public policy of this state that the proceedings of public agencies, and the conduct of the public's business, shall take place at open meetings, and that the deliberative process by which decisions related to the public's business are made shall be conducted in full view of the public." (*Epstein v. Hollywood Entertainment Dist. II Bus. Improvement Dist.* (2001) 87 Cal.App.4th 862, 867 [104 Cal.Rptr.2d 857].) To this end, the Brown Act "requires that most meetings of a local agency's legislative body be open to the public for attendance by all." (*Los Angeles Times Communications v. Los Angeles County Bd. of Supervisors* (2003) 112 Cal.App.4th 1313, 1321 [5 Cal.Rptr.3d 776]; see § 54953.)

In the early years of the Brown Act, the term "meeting" was interpreted to refer solely to traditional, formal meetings. (E.g., *Adler v. City Council* (1960) 184 Cal.App.2d 763, 775 [7 Cal.Rptr. 805].) In 1961, however, the Legislature considerably broadened the act by passing amendments "intended to bring informal deliberative and fact-finding meetings within its scope." (*Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 375 [20 Cal.Rptr.2d 330, 853 P.2d 496] (*Roberts*).) In *Sacramento Newspaper Guild v. Sacramento*

*County Bd. of Suprs.* (1968) 263 Cal.App.2d 41 [69 Cal.Rptr. 480] (*Sacramento Newspaper Guild*), the court gave definitive effect to that broadened scope, holding that a private Elks Club meeting attended by the members of a county board of supervisors, at which the members openly discussed an issue before the board, constituted a "meeting" for purposes of the new amendments. (*Id.* at pp. 45, 51.) Reviewing the legislation's history, the court concluded that the Legislature intended that "deliberation as well as action occur openly and publicly. Recognition of deliberation and action as dual components of the collective decision-making process brings awareness that the meeting concept cannot be split off and confined to one component only, but rather comprehends both and either." (*Id.* at p. 47.) Explaining the Legislature's motives, the court noted that "a statute may push beyond debatable limits in order to block evasive techniques. An informal conference or caucus permits crystallization of secret decisions to a point just short of ceremonial acceptance. There is rarely any purpose to a nonpublic premeeting conference except to conduct some part of the decisional process behind closed doors. Only by embracing the collective inquiry and discussion stages, as well as the ultimate step of official action, can an open meeting regulation frustrate these evasive devices." (*Id.* at p. 50, fn. omitted.)

In *Stockton Newspapers, Inc. v. Redevelopment Agency* (1985) 171 Cal.App.3d 95 [214 Cal.Rptr. 561] (*Stockton Newspapers*), the court considered an "evasive device" beyond an informal gathering of the members of a legislative body. In that case, the plaintiff challenged a series of telephone calls initiated by legal counsel for a local agency to individual members of the agency's governing board, which the complaint described as a " 'poll . . . for the purpose of obtaining a collective commitment or promise' " from the members on an issue before the board. (*Id.* at p. 99.) The court began with the premise that "the concept of 'meeting' under the Brown Act comprehends informal sessions at which a legislative body commits itself collectively to a particular future decision concerning the public business." (*Id.* at p. 102.) Turning to the immediate issue, the court noted, "Considering the ease by which personal contact is established by use of the telephone and the common resort to that form of communication in the conduct of public business, no reason appears why the contemporaneous physical presence at a common site of the members of a legislative body is a requisite of such an informal meeting. Indeed if face-to-face contact of the members of a legislative body were necessary for a 'meeting,' the objective of the open meeting requirement of the Brown Act could all too easily be evaded." (*Ibid.*) Discussing the legality of the telephone calls under the Brown Act, the court noted the "indispensability to plaintiff's complaint of the allegation that 'each of the defendants . . . participated in a one-to-one telephonic poll initiated by . . . [the attorney] . . . for the purpose of obtaining a collective

commitment or promise by said defendants to [take action].' The allegation . . . is arguably open to the interpretation that as the initiator of the telephonic poll, [the attorney] alone harbored the intent to secure the collective promise of defendants to [take action]. However, the allegation is also reasonably susceptible to the construction that each of the defendants, through the agency of [the attorney], concurred in the purpose of arriving at a collective commitment through the medium of the serially conducted telephonic poll. If a quorum of the members of the legislative body so intended to unite in an agreement to agree, a violation of the Brown Act would be established." (*Stockton Newspapers, supra,* 171 Cal.App.3d at p. 103.) Subsequent decisions have accepted that so-called "serial meetings" may constitute a violation of the Brown Act. (E.g., *Roberts,* at p. 376 ["a concerted plan to engage in collective deliberation on public business through a series of letters or telephone calls passing from one member of the governing body to the next would violate the open meeting requirement"]; *216 Sutter Bay Associates v. County of Sutter* (1997) 58 Cal.App.4th 860, 877 [68 Cal.Rptr.2d 492].)

An important qualification to the general rule that informal deliberation is within the scope of the Brown Act is "that some sort of *collective* decision-making process be at stake. Thus the action of one public official is not a 'meeting' within the terms of the act . . . . [B]ecause the act uniformly speaks in terms of collective action, and because the term 'meeting,' as a matter of ordinary usage, conveys the presence of more than one person, it follows that under section 54953, the term 'meeting' means that 'two or more persons are required in order to conduct a "meeting" within the meaning of the Act.' [Citation.]" (*Roberts, supra,* 5 Cal.4th at pp. 375–376, italics added.) Accordingly, in *Roberts,* the Supreme Court held that the distribution to each member of the city council of a legal memorandum written by the council's attorney did not constitute a serial "meeting," in the absence of evidence that the council members deliberated *collectively* with respect to the memorandum or its general subject matter. (*Id.* at pp. 376–377.) As the court concluded, the Brown Act "was intended to apply to collective action of local governing boards and not to the passive receipt by individuals of their mail." (*Roberts,* at p. 376.)

Along similar lines, in *Frazer v. Dixon Unified School Dist.* (1993) 18 Cal.App.4th 781 [22 Cal.Rptr.2d 641] (*Frazer*), the court rejected the argument that the distribution of information to members of a local agency by the agency's staff triggered the Brown Act, noting "we do not believe that the one-way transmission to and solitary review by Board members of background materials relating to the . . . controversy is within the ambit of the open meeting laws. Unlike the 'serial' meetings at issue in *Stockton*

*Newspapers, Inc., supra,* [171 Cal.App.3d 95] the transmission of informational materials in this case undisputedly involved no interaction or communication between or among individual Board members, either directly or through the agency of District staff." (*Frazer,* at p. 797.)

B.  *The Current Statutory Language*

■    After *Sacramento Newspaper Guild, Stockton Newspapers,* and *Roberts* were decided, the substance of their rulings, if not their precise approach, was incorporated into the text of the Brown Act through amendment of section 54952.2, which was enacted in essentially its present form in 1993. (Stats. 1993, ch. 1137, § 2, pp. 6371–6372.) Section 54952.2, subdivision (a) now defines a "meeting" for purposes of the Brown Act as "any congregation of a majority of the members of a legislative body at the same time and place to hear, discuss, or deliberate upon any item that is within the subject matter jurisdiction of the legislative body or the local agency to which it pertains." Meetings, as so defined, are prohibited unless they are "open and public." (§ 54953.)

While *Roberts* considered a "meeting" to occur upon the gathering of two or more persons, the definition in section 54952.2 of a "meeting" as a gathering of a majority of the members of a legislative body leads to a slightly different result. For all legislative bodies of more than three members, a prohibited nonpublic meeting now requires at least three persons. In fact, two-person "meetings" are given statutory protection by section 54952.2, subdivision (c), which states, "Nothing in this section shall impose the requirements of this chapter upon any of the following: [¶] (1) Individual contacts or conversations between a member of a legislative body and any other person."

■    The current language of the Brown Act contains no reference to, and does not expressly prohibit, serial meetings. Nonetheless, the substance of *Stockton Newspapers* is preserved in subdivision (b) of section 54952.2, which prohibits the members of a legislative body, acting outside a public meeting, from using "direct communication, personal intermediaries, or technological devices" as a means for "a majority of the members of the legislative body to develop a collective concurrence as to action to be taken on an item by the members of the legislative body."[5] In other words, section 54952.2, subdivision (b) now prohibits a legislative body from using virtually

---

[5] Section 54952.2, subdivision (b), states in full, "Except as authorized pursuant to Section 54953, any use of direct communication, personal intermediaries, or technological devices that is employed by a majority of the members of the legislative body to develop a collective concurrence as to action to be taken on an item by the members of the legislative body is prohibited."

any means—whether "direct communication, personal intermediaries, or technological devices"—to reach a "collective concurrence" outside the public forum.[6]

### C. *The Claims Against the City and the City Council*

On appeal from the grant of a demurrer, "our standard of review is clear: ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] . . ." Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.]' " (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171].) Further, " '[i]t is the rule that when a plaintiff is given the opportunity to amend his complaint and elects not to do so, strict construction of the complaint is required and it must be presumed that the plaintiff has stated as strong a case as he can.' [Citation.]" (*Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1091 [32 Cal.Rptr.3d 483, 116 P.3d 1162].)

In construing the language of a statute, "[t]he well-settled objective . . . is to ascertain and effectuate legislative intent. [Citations.] To determine that intent, we turn first to the words of the statute, giving them their usual and ordinary meaning. [Citations.] When the statutory language is clear, we need go no further." (*In re Derrick B.* (2006) 39 Cal.4th 535, 539 [47 Cal.Rptr.3d 13, 139 P.3d 485].) In construing the language of the act, we are instructed that "the Brown Act is a remedial statute that must be construed liberally so as to accomplish its purpose." (*Epstein v. Hollywood Entertainment Dist. II Bus. Improvement Dist., supra,* 87 Cal.App.4th at p. 869.)

While mindful that we must read the complaint " 'as a whole and its parts in their context' " (*Zelig v. County of Los Angeles, supra,* 27 Cal.4th at p. 1126), we find that it clarifies our analysis to consider, in the first instance, the allegations of the complaint concerning the activities of Diaz separately from those of the council members.

### 1. *The City Manager's Activities*

Wolfe places primary emphasis on the activities of Diaz, who, he contends, acted improperly by meeting with the council members. Early in the complaint, Wolfe alleges that Diaz "met individually and privately with a majority

---

[6] Accordingly, serial individual meetings that do not result in a "collective concurrence" do not violate the Brown Act. This is in contrast to nonpublic "meetings," as that term is defined in section 54952.2, subdivision (a), which are unconditionally prohibited. (§ 54953.)

of the members of the City Council" to discuss the new policy "and to obtain . . . their support for the plan [and] their collective concurrence to take no action in regard to the plan . . . ." Subsequently, he alleges that through the meetings Diaz "obtained the support and collective concurrence of a majority of the members of the City Council to support" the verified response policy "and to take no Council action in regard to [the policy] or in regard to the Fremont False Alarm Ordinance."

■   Wolfe's initial contention that the Brown Act was violated merely by meetings between Diaz and individual council members for the purpose of discussing the verified response policy is inconsistent with the statutory language. So long as only a single council member was involved in each meeting, they could not have constituted a prohibited nonpublic "meeting" under sections 54952.2, subdivision (a) and 54953, and the Brown Act contains no absolute prohibition on individual, serial meetings. On the contrary, a city manager's oral communication of policy-related information to council members, in its essence, is not different from the sending of written memoranda to council members, approved in *Roberts* and *Frazer*. While it is true that personal meetings permit an interchange of views, unlike the distribution of a written memorandum, the Brown Act does not preclude members of a local legislative body from engaging in one-on-one discussions of matters before the body. Rather, as noted above, section 54952.2, subdivision "(c) expressly states that the Brown Act does not prohibit "[i]ndividual contacts or conversations between a member of a legislative body and any other person."

This is not to imply that serial meetings between a city official and individual members of the city council can never lead to a violation of the Brown Act, but more than mere policy-related informational exchanges are required before such a violation will occur. Under section 54952.2, subdivision (b), the Brown Act is violated by such serial meetings only if (1) the city official acts as a "personal intermediar[y]" for council members during the course of such meetings and (2) the meetings are used by a majority of the legislative body to develop a "collective concurrence" regarding a matter of interest.

While Wolfe alleges that Diaz's activities went beyond merely supplying policy-related information to the council members, we conclude that, for two reasons, the allegations nonetheless fail to state a claim under section 54952.2, subdivision (b). First, as the City argues, the complaint fails to allege that Diaz acted as an intermediary regarding the new policy. As noted above, the Brown Act is not violated by serial meetings between council members and a nonmember unless the nonmember acts as a "personal intermediary" among the council members. Because the act does not define "intermediary," we look

first to the dictionary for its "usual and ordinary" meaning (see, e.g., *Bernard v. Foley* (2006) 39 Cal.4th 794, 807 [47 Cal.Rptr.3d 248, 139 P.3d 1196]), where we find that an intermediary is a "go-between." (Merriam Webster's Collegiate Dict. (10th ed. 2000) p. 610, col. 1.) In other words, Wolfe was required to allege facts from which it could be concluded that Diaz acted as a personal go-between among council members, a role that would require Diaz, at a minimum, to make the council members aware of each other's views.[7] Not only does the complaint contain no express allegation that Diaz acted as an intermediary, it contains no allegation of facts from which such a role can be found. When discussing Diaz's activities, all the complaint alleges is that Diaz attempted to persuade council members to his *own* views regarding the new policy, not that he acted as a go-between to pass information or views from one council member to another.

Second, the allegations regarding Diaz's activities do not demonstrate the development of a "collective concurrence" by a majority of the City Council. The statute does not define this phrase. In *Roberts* and *Frazer*, which were rendered a short time before passage of the 1993 amendments, the term "collective" was used to refer to "interaction or communication between or among individual Board members, either directly or through the agency of . . . staff." (*Frazer, supra,* 18 Cal.App.4th at p. 797.)[8] "Concurrence," according to the dictionary, is an "agreement or union in action." (Merriam Webster's Collegiate Dict., *supra,* at p. 239, col. 2.) Combining the two, a "collective concurrence" would require not only that a majority of the council members share the same view, or "concur," but also that the members have reached that shared view after interaction between or among themselves, whether directly or through an intermediary. By requiring collective action in addition to a concurrence, the definition promotes the policy behind the act, which is to ensure that the deliberations—that is, the discussion of matters leading to a decision—of public bodies are done in public. (§ 54950.) It is also consistent with the conclusion reached in *Stockton Newspapers* that the act's requirement of public meetings "comprehends informal sessions at which a legislative body commits itself *collectively* to a particular future decision concerning the public business." (*Stockton Newspapers, supra,* 171 Cal.App.3d at p. 102, italics added.)

---

[7] This must be distinguished from residents seeking to influence the views of individual council members by privately sharing and arguing their views on issues before the council. "Lobbying," loosely defined, is not prohibited by the Brown Act so long as it is not conducted with a group of members large enough to constitute a majority of the legislative body.

[8] While we view the judicial interpretation to be a better guide to the meaning of the term than the dictionary, given the closeness in time of these decisions and the amendment of the act, the dictionary's meaning does not differ substantially. Although several definitions of "collective" are provided, the first is "denoting a number of persons or things considered as one group or whole," which provides a similar implication. (Merriam Webster's Collegiate Dict., *supra,* at p. 225, col. 1.)

The complaint's factual allegations with respect to Diaz's activities state only that he met individually with a majority of the members of the City Council and that those members expressed the view that they supported taking no action with respect to the verified response policy.[9] As is implicit in the above discussion, however, the mere fact that a majority of the members of the legislative body have reached the same conclusion about an action does not constitute a violation of the Brown Act if the members reached that conclusion acting independently of one another, without deliberation among themselves. Under those circumstances, any concurrence was not "collective." Wolfe's allegations regarding the activities of Diaz contain no indication that the council members reached their consensus with an awareness of each other's views, let alone that they reached it as a result of direct or indirect interaction among themselves. Accordingly, considered in isolation, the allegations about Diaz's activities fail to state a claim under section 54952.2, subdivision (b).

### 2. The Activities of the City Council

Wolfe's allegations were not, however, restricted to the activities of Diaz; he also described the activities of council members themselves. Initially, Wolfe alleges that "a majority of the defendant City Council members discussed the[se] matters . . . among themselves prior to February 22, 2005."[10] He then alleges that Councilmember Dutra acknowledged at the March hearing that the "[City] Council had been fully briefed on the 'verified response' proposal and had expressed their support" in advance of the prior meeting.

Just as the council members were not prohibited from meeting with Diaz by the Brown Act, they were not prohibited from discussing the new policy with each other in separate, one-on-one conversations; on the contrary, such discussions appear to be expressly authorized by section 54952.2, subdivision (c), which permits "[i]ndividual contacts or conversations between a member of a legislative body and any other person." Nonetheless, subdivision (c) must be read together with subdivision (b), which holds that if such "direct communication" among members of a legislative body leads to a consensus about action to be taken on an item, a violation of the Brown Act has occurred.

---

[9] In making this analysis, we consider only Wolfe's factual allegations, disregarding his conclusory allegation that the City Council reached a "collective concurrence" as a result of Diaz's meetings. (*Zelig v. County of Los Angeles, supra,* 27 Cal.4th at p. 1126.)

[10] Wolfe does not argue that this somewhat vague allegation is intended to mean that a majority of the City Council gathered at one time to discuss the new policy, thereby violating sections 54952.2, subdivision (a) and 54953. We construe the allegation to refer to one-on-one discussions between council members.

█   Wolfe's allegations about the activities of the City Council allow the inference that, prior to the February meeting, the council members had improperly reached a "collective concurrence" that they would not challenge the verified response policy. Initially, Dutra's statement that all council members had "expressed their support" for the verified response policy necessarily demonstrates that the City Council had reached a concurrence prior to the February 22 meeting, since all members shared the same view. If that shared view was reached "collectively," the Brown Act was violated. On this issue, we find persuasive the allegations, first, that the council members discussed the issue among themselves, providing an opportunity for collective action; second, that Dutra claimed to be aware of the views of each of his fellow council members, presumably because they told him what their views were; and, third, that he purported to have been aware of those views before any public City Council discussion of the issue had occurred at the February 22 meeting. While we are unwilling to infer that Diaz was sharing views among the council members in the absence of an affirmative allegation of such conduct, we have no similar reluctance when council members hold discussions among themselves. These allegations lead directly to the inference that the council members had reached their consensus through the nonpublic discussions that occurred among them, thereby violating the act. Supporting this inference is the council members' decision to have Steckler address them at the February meeting in advance of the public comment period, an action that creates the impression of a concerted effort to shape public perceptions of the new policy. Accordingly, although the allegations of the complaint are not wholly free from ambiguity, when given the requisite "reasonable interpretation, read[] . . . as a whole and . . . in their context" (*Zelig v. County of Los Angeles, supra*, 27 Cal.4th at p. 1126), they are sufficient to state a claim for a violation of section 54952.2, subdivision (b) of the Brown Act.

In reaching this conclusion, we give no weight to Wolfe's conclusory allegations that the city manager had a general practice of meeting with council members to develop a collective concurrence and that the City Council had a practice of using closed sessions for a similar purpose. While these allegations might, in general terms, recite a violation of the Brown Act, they are simply too vague and general to state a legal claim. Without specific examples of misconduct, they are little more than a reiteration of the elements of the statute. "It is settled law that a pleading must allege facts and not conclusions, and that material facts must be alleged directly and not by way of recital. [Citation.] . . . [C]onclusionary allegations . . . , without facts to support them, are ambiguous." (*Ankeny v. Lockheed Missiles & Space Co.* (1979) 88 Cal.App.3d 531, 537 [151 Cal.Rptr. 828].) The complaint recites the necessary *facts* only with respect to the City Council's handling of the verified response policy.

The City argues that no violation of the Brown Act could have occurred because the complaint alleges that it was Diaz, rather than the members of the City Council, who held the intent to create a collective consensus. The complaint, however, alleges not only that Diaz had conversations with the council members but also that the council members spoke among themselves about the verified response policy. Section 54952.2, subdivision (b), in proscribing the use of "direct communication" to reach a collective concurrence, does not include a requirement that the use have been intentional. If a collective concurrence results from direct communication among members of the legislative body, it does not matter whether the participants intended that result.[11] The absence of an intent requirement is consistent with the purpose of the act, which is not merely to prevent conscious backroom deals but to ensure that collective deliberations, whatever their outcome, are conducted in public.[12]

## D. *The Claims Against Diaz and Steckler*

The trial court relied on *Boyle v. City of Redondo Beach* (1999) 70 Cal.App.4th 1109 [83 Cal.Rptr.2d 164] (*Boyle*), in dismissing the claims against Diaz and Steckler. In *Boyle*, the plaintiff sued a city, the members of the city council, the mayor, the city attorney, and a private law firm that represented various city officials, alleging that they violated the Brown Act by discussing a separate lawsuit filed by the plaintiff against the city at city council meetings without having first placed that item on the agenda. (*Boyle*, at p. 1114.) At the conclusion of the opinion, in addressing an award of costs to the private law firm, the court commented, "we find that Boyle's appeal as to [the private law firm] was totally lacking in merit. Given the requirements for a complaint alleging violations of the Brown Act as stated in section 54960.1, no reasonable attorney would have named outside counsel defendants in the complaint. The outside counsel defendants are not a legislative body of a local agency; therefore no 'action taken' by outside counsel defendants occurred, and Boyle made no timely demand that outside

---

[11] In light of the allegations of the complaint, we have no occasion to decide whether the use of a "personal intermediary" to reach a collective consensus must be intentional in order to constitute a violation under section 54952.2, subdivision (b). We express no opinion on that issue.

[12] We note that for purposes of this decision we assume without deciding that the council members' collective concurrence to take no action with respect to the verified response policy constituted a concurrence on "action to be taken on an item" for purposes of section 54952.2, subdivision (b). Although the City argued in the trial court that no Brown Act violation could have occurred because the meetings were intended only to build a consensus around an administrative policy or about a matter that was not currently on the council's agenda, the City does not raise those arguments in this court. Nor does the City argue, as it did before the trial court, that the City Council's consideration of the verified response policy did not violate the Brown Act because police department internal policies are beyond the City Council's jurisdiction. (See § 54952.2, subd. (a).)

counsel cure or correct the action allegedly taken in violation of the Brown Act." *(Boyle,* at p. 1122.)[13]

Wolfe distinguishes *Boyle* by arguing that it involved a private law firm, not a public employee engaged in day-to-day work with the city council. He argues that he should be permitted to join Diaz and Steckler because "[n]ormally, agents and administrators who act or threaten to act unlawfully on behalf of a . . . public entity may be named as defendants in legal actions seeking declaratory and injunctive relief to stop the unlawful action," citing *Serrano v. Priest* (1976) 18 Cal.3d 728, 752 [135 Cal.Rptr. 345, 557 P.2d 929].

■ There are no clear requirements governing the joinder of parties defendant in an action alleging the governmental violation of a statutory duty. The surest justification for joining a particular governmental official, body, or agency is that the putative defendant's conduct violated a statutory duty, whether owed to the plaintiff personally or more generally to the public, as an incident of the defendant's public duties. (See, e.g., *City of Rancho Cucamonga v. Regional Water Quality Control Bd.* (2006) 135 Cal.App.4th 1377, 1383 [38 Cal.Rptr.3d 450] [dismissing claim against State Water Resources Control Board because the plaintiff's "allegations did not articulate any improper State Board conduct"]; *Boyle, supra,* 70 Cal.App.4th at p. 1122.) Alternatively, even in the absence of such a violation of duty, courts have permitted the joinder of entities or individuals who, by virtue of their position in the bureaucratic hierarchy, are "responsible for the conduct" of a party or entity that is alleged to have committed a violation of a statute or the Constitution. *(Flightsafety Internat., Inc. v. Assessment Appeals Bd.* (2003) 105 Cal.App.4th 620, 629, fn. 13 [129 Cal.Rptr.2d 539].) The latter principle accounts for the joinder of high-level state executive officers in actions challenging the validity of a governmental policy, as in *Serrano v. Priest,* in which the court commented, "it is the general and long-established rule that in actions for declaratory and injunctive relief challenging the constitutionality of state statutes, state officers with statewide administrative functions under the challenged statute are the proper parties defendant." *(Serrano v. Priest, supra,* 18 Cal.3d at p. 752.)

■ We agree with the implicit holding of *Boyle* that the provisions of the Brown Act, at least those involved in this action, do not regulate the conduct of persons other than the members of the legislative bodies of local agencies, thereby precluding any statutory violation by either Diaz or Steckler. The

---

[13] Section 54960.1, subdivision (a) states in part that "[t]he district attorney or any interested person may commence an action by mandamus or injunction for the purpose of obtaining a judicial determination that an action taken by a legislative body of a local agency in violation of Section 54953 . . . is null and void under this section."

only relevant section of the act that implicates the conduct of persons other than legislators, subdivision (b) of section 54952.2, which refers to "personal intermediaries," prohibits only the "use" of such intermediaries by the legislators, not the act of being an intermediary. The focus of the statute on the conduct of legislators is emphasized by section 54959, which imposes a criminal penalty in connection with a violation of the act. Section 54959 imposes such a penalty only upon members of the legislative body involved in the violation.[14] Similarly, the statute permitting civil enforcement of the act permits "an action . . . for the purpose of stopping or preventing violations or threatened violations of this chapter *by members of the legislative body* . . . ." (§ 54960, subd. (a), italics added.) There is no reference to any other type of governmental official.[15] Even if Diaz were, as Wolfe argues, an agent or representative of the City Council, this fact alone would not justify his joinder on a claim that necessarily challenges only the actions of the council members themselves. Wolfe cites no authority supporting the assertion of a claim against an agent or representative of a public body in these (or any other) circumstances. Finally, in the absence of statutory authority, we reject the argument that we should recognize a civil cause of action for aiding and abetting a Brown Act violation.[16] Given the purpose of the act, there is simply no need for such a claim.

Nor is either defendant responsible for, or even capable of asserting control over, the conduct of the City Council. This is obviously true of Steckler, the police chief, whose job involves only incidental contact with the council. It is also true of Diaz. Although the city manager may regularly work with and advise the council, he has no legal authority over its conduct. On the contrary, Fremont Municipal Code section 2-2107 states that the city manager acts under "the direction and control of the city council," not vice versa. There is simply no justification, either in law or policy, for permitting the joinder of the city manager or police chief under these circumstances. The trial court properly granted a demurrer with respect to these defendants.

---

[14] Section 54959 states, "Each member of a legislative body who attends a meeting of that legislative body where action is taken in violation of any provision of this chapter, and where the member intends to deprive the public of information to which the member knows or has reason to know the public is entitled under this chapter, is guilty of a misdemeanor."

[15] In this regard, we reject Wolfe's argument that Diaz was a member of the City Council. There is no allegation that he was elected to the council or appointed to serve as a member. The fact that he may have worked closely with the City Council in his official capacity did not make him a member of the body.

[16] We also reject Wolfe's argument that Diaz had "a duty to follow and enforce the Brown Act which [a] taxpayer action may enforce." For support, Wolfe relies primarily on a Fremont City ordinance imposing upon the city manager a "duty" to "see that all laws and ordinances of the city are duly enforced." (Fremont Mun. Code, § 2-2107, subd. (a).) Such an ordinance does not make the city manager a proper party to a lawsuit whenever a law or ordinance is violated in the City. The same is true of the various other ordinances cited by Wolfe that describe the city manager's duties with respect to the City Council.

## III.   DISPOSITION

The trial court's judgment as to defendants Diaz and Steckler is affirmed. The trial court's judgment regarding defendants City, City Council, and the individual members of the City Council is reversed, and the matter is remanded for further proceedings regarding these defendants consistent with this decision. The parties shall bear their own costs on appeal.

Stein, Acting P. J., and Swager, J., concurred.

A petition for a rehearing was denied November 30, 2006, and the opinion was modified to read as printed above.