TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

ROB BONTA
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | |
| | : | No. 22-402 |
| of | : | |
| | : | February 29, 2024 |
| ROB BONTA | : | |
| Attorney General | : | |
| | : | |
| MANUEL M. MEDEIROS | : | |
| Deputy Attorney General | : | |

The HONORABLE JASON ANDERSON, SAN BERNARDINO COUNTY DISTRICT ATTORNEY, has requested an opinion on a question relating to the Ralph M. Brown Act (Gov. Code, § 54950 et seq.).

**QUESTION PRESENTED AND CONCLUSION**

Is the Executive Committee of the San Bernardino County District Advocates for Better Schools a "legislative body" within the meaning of the Brown Act?

Yes, as the governing body of an entity created by local school districts to engage in legislative advocacy on their behalf, the Executive Committee of the San Bernardino County District Advocates for Better Schools is a legislative body within the meaning of the Brown Act.

**BACKGROUND**

The San Bernardino County District Advocates for Better Schools (SANDABS) is a legislative advocacy group whose eligible membership includes the San Bernardino County Superintendent of Schools, school districts, and other local educational agencies

in San Bernardino County (collectively, the "school districts").[1]  All school districts desiring membership in SANDABS must execute an annual membership agreement and contribute an amount of district funds as "dues," calculated based on average daily attendance.[2]  These dues fund the SANDABS program.[3]

The SANDABS program is managed by a 22-member Executive Committee, which includes nine school board trustees and nine district superintendents representing three geographical regions in San Bernardino County.[4]  The representative superintendents are selected from among all the county's district superintendents at an annual meeting.  The nine school board representatives are selected by the San

---

[1] See SANDABS Bylaws, art. III, § 1, available at https://tinyurl.com/2mzxr4rt (as of Feb. 27, 2024) (hereafter, "SANDABS Bylaws").  For convenience we use the term "school district" to include a Special Education Local Plan Area or a Regional Occupational Program.  All are "Local Educational Agencies" in San Bernardino County. (See Ed. Code § 56026.3.)  Our use of the term "school board" is intended to encompass all local education agency governing boards in San Bernardino County; there are some 30 school districts, two Special Education Local Plan Areas, and two Regional Occupational Programs in the county.  (See County Superintendent's website, https://tinyurl.com/yxbjpwyf (as of Feb. 27, 2024).  We are not aware of any school districts within the county that are not members of SANDABS.

[2] SANDABS Bylaws, art. III, § 2.  A sample agreement for 2018-2019 accompanied the District Attorney's request for opinion, and we have appended a copy that sample to this opinion as Appendix A.  The specific language of the Annual Agreement appears to change periodically.  (See, e.g., SANDABS Annual Membership Agreement, Agenda, East Valley Special Education Local Plan Area Board of Directors (Sept. 21, 2022), Exhibit for Action Item 7a, available at https://tinyurl.com/4crmr5r3, p. 143 of 203 (as of Feb. 27, 2024.)

[3] See Proposed 2022-2023 Budget, Business Services Detail, MG: 7098 SANDABS, p. 31 (Management Narrative: "San Bernardino County District Advocates for Better Schools is a legislative advocacy group providing a communication link between the education community in the county and legislators in Sacramento and Washington, D.C. Funded by annual membership dues"), available at https://tinyurl.com/93y4cr42 (as of Feb. 27, 2024).

[4] In addition to the 18 district superintendents and trustees, the Executive Committee includes the County Superintendent, the president and legislative chair of the San Bernardino County School Boards Association, and the director of California School Boards Association Region 16B.  (SANDABS Bylaws, arts. IV, V, at pp. 3-6).

Bernardino County School Boards Association at an annual meeting. Executive Committee members serve two-year terms.[5]

SANDABS program expenses are budgeted by the County Superintendent and approved by the County Board of Education.[6] The Intergovernmental Relations Department of the County Superintendent's office administers and supports the SANDABS Executive Committee's operations.[7] As mentioned, SANDABS engages in legislative advocacy, and the County Superintendent is the "responsible officer" for SANDABS as a lobbyist employer.[8] The County Superintendent's responsibilities in relation to the Executive Committee include:

- Preparing and distributing meeting notices, appropriate backup materials, agendas, minutes, communication, and correspondence in cooperation with the co-chairs;

- Coordinating advocacy efforts, delegation meetings, and development of annual state and federal legislative platforms with state and federal legislative advocates;

- Working in concert with Executive Committee to identify opportunities to align and mobilize collective advocacy; and

- Evaluating attempts to strategically align, abandon, and strengthen legislative advocacy efforts.[9]

The County Superintendent enjoys significant influence in Executive Committee affairs. He or his designee sits as a permanent voting member of the Executive Committee and chairs that Committee in the absence of the co-chairs.[10] Although the annual agreement purports to be an agreement among three entities—the Executive Committee, the County Superintendent, and the applicant school district—in fact the

---

[5] See San Bernardino County School Boards Association Bylaws, art. V, § 3, at p. 3, available at https://tinyurl.com/3dsnwk6r (as of Feb. 27, 2024).

[6] See note 3, *ante.*

[7] *Ibid.*

[8] Secy. of State, Lobbying Activity, San Bernardino County District Advocates for Better Schools (SANDABS), https://tinyurl.com/4pvdhjdt (as of Feb. 27, 2024).

[9] Appx. A ("RESPONSIBILITIES OF SUPERINTENDENT"); SANDABS Bylaws, *supra*, art. X.

[10] SANDABS Bylaws, art. IV, § 1, VI, § 3.

22-402

County Superintendent is the only signatory to the agreement apart from the individual applicant district.[11]  The County Superintendent's staff are the sole conduits of communication between the Executive Committee and SANDABS's legislative advocates.[12]  Executive Committee members themselves may not communicate directly with an advocate except as previously arranged by designated County Superintendent staff.[13]

The agenda of every monthly Executive Committee meeting advises the public that they will *not* be afforded an opportunity to comment, declaring that the Committee is exempt from the open-meeting requirements of the Ralph M. Brown Act (hereafter, Brown Act or Act):

> The San Bernardino County District Advocates for Better Schools (SANDABS) Executive Committee is made up of public education representatives in San Bernardino County.  SANDABS is not a local educational agency, and the Executive Committee is not a "legislative body" of a local agency, as that term is defined under Government Code section 54952 of the Ralph M. Brown Act (Gov. Code section 54950 et seq.).  As such, while the San Bernardino County Superintendent of Schools (SBCSS) maintains an online presence for SANDABS to inform members of the public of its operations, meetings do not include an opportunity for public comment in order to facilitate the business of the Executive Committee.[14]

On October 11, 2023, the Executive Committee amended its Bylaws to declare itself excluded from coverage under the Brown Act.  "SANDABS is not a local educational agency, and the Executive Committee is not a 'legislative body' of a local agency, as that term is defined under Government Code section 54952 of the Ralph M. Brown Act (Gov. Code section 54950 et seq.)"[15]  The reason for the amendment is not apparent.

---

[11] See Appx. A.

[12] SANDABS Bylaws, art. XI, § 2.

[13] *Ibid.*

[14] *Id.*, art. VII, § 3; see, e.g., SANDABS Executive Committee Agenda, Feb, 8, 2023, available at https://tinyurl.com/5549mmp7 (as of Feb. 27, 2024).  We note, however, that the Executive Committee allows comments from legislative representatives.

[15]  See SANDABS Bylaws, art. I, § 1; Minutes, Executive Committee Meeting (Oct. 11, 2023), Item 3.2.1 (adopting amendments), available at https://tinyurl.com/2p8bwjav (as of Feb. 27, 2024)

22-402

The Brown Act governs meetings conducted by "legislative bodies," as defined in Government Code section 54952. The Act imposes an "open meeting" requirement, which mandates (among other things) that "[e]very agenda for regular meetings shall provide an opportunity for members of the public to directly address [a] legislative body on any item of interest to the public, before or during the legislative body's consideration of the item."[16] We have previously observed that the Brown Act "not only allows members of the public to attend the legislative body's meetings, it allows the public to participate in the decision-making process by presenting testimony."[17]

Our requestor, the San Bernardino County District Attorney, has jurisdiction to enforce the open-meeting requirements of the Act, and we are informed that he has received a complaint alleging that the Executive Committee has failed to comply with the Act.[18] We have not been informed whether the SANDABS Executive Committee is alleged to violate the Brown Act in any manner other than by failing to provide for public comment. The County Superintendent informs us that "while SANDABS has historically promoted transparency in its work for public policy reasons by holding public meetings or publicly posting meeting materials, the Executive Committee is not required to comply with the specific provisions of the Brown Act in carrying out its work."[19] The County Superintendent is of the view that the Executive Committee is not a legislative body, and has so advised the District Attorney.[20]

Before taking further action, the District Attorney has asked for our opinion on the question whether the SANDABS Executive Committee is a "legislative body" within the meaning of section 54952. We are authorized to give our opinion to district attorneys, as well as to other specified public officials, "upon any question of law relating to their offices."[21]

## ANALYSIS

The Government Code authorizes school districts to engage in legislative advocacy, either directly or through a representative.[22] And a school district is authorized

---

[16] Gov. Code, § 54954.3, subd. (a).

[17] 90 Ops.Cal.Atty.Gen. 47, 50 (2007).

[18] Gov. Code, §§ 54960, 54960.1, 54960.2.

[19] Letter from County Superintendent, May 31, 2022, p. 11 (on file) (hereafter, "County Superintendent Letter").

[20] County Superintendent Letter, p. 3, fn. 1.

[21] Gov. Code, § 12519.

[22] Gov. Code, § 53060.5 ("Any district, directly or through a representative, may attend

5

to associate with other districts for the purpose of legislative advocacy, through a representative of the association that they have formed for that purpose.[23]  Where, as here, the governing boards of multiple school districts in a county collaborate with the County Superintendent to create an association among themselves, for the purpose of lobbying on behalf of the association's member school districts, we believe that the Brown Act is implicated.

**The Brown Act**

City councils and school boards fit squarely within the Brown Act's definition of a "legislative body," inasmuch as that definition expressly includes the "governing body of a local agency."[24]  The SANDABS Executive Committee differs in several respects from such governing bodies.  As we have observed in our published Brown Act guide, however, "[u]nder specified circumstances, meetings of boards, commissions, committees or other multi-member bodies that govern private corporations, limited liability companies *or other entities* may become subject to the open meeting requirements of the Act."[25]  As discussed below, we view SANDABS as such an entity.

The Brown Act did not appear in a legislative vacuum.  One commenter points out that the context for the Act's adoption was a series of articles by investigative reporter Michael Harris published in 1952, which exposed local government's dismissive attitude to open meeting requirements and the tactics adopted to avoid them.[26]  California had

---

the Legislature or any other legislative body, including Congress, and any committees thereof and present information to aid the passage of legislation which the district deems beneficial to the district or to prevent the passage of legislation which the governing board of the district deems detrimental to the district.  The cost and expense incident thereto are proper charges against the district. . . .")

[23] *Ibid.* ("Such districts may enter into and provide for participation in the business of associations and through a representative of the associations attend the Legislature, or any other legislative body, including Congress, and any committees thereof, and present information to aid the passage of legislation which the association deems beneficial to the districts in the association, or to prevent the passage of legislation which the association deems detrimental to the districts in the association.  The cost and expense incident thereto are proper charges against the districts comprising the association").

[24] Gov. Code, § 54952, subd. (a).

[25] California Attorney General's Office, The Brown Act: Open Meetings for Local Legislative Bodies (2003), p. 6, italics added.

[26] Oakes & Killingley, *California's Brown Act: Clearing the Smoke-Filled Room* (2021) 58 Cal. Western L. Rev. 1, 5.

22-402

laws prior to 1952 requiring that government business be conducted in open public meetings.[27]  Nevertheless, Harris reported that "these laws were routinely flouted by simply labelling such meetings with other names—caucus, star chamber, executive session, committee-of-the-whole, pre-council meeting, work session, and study meeting. In this way, Bay Area councils and boards contrived to avoid the reach of the legislation and to conduct in private business that should have been conducted in public."[28]

In 1953, the Legislature enacted what later became known as the Brown Act.[29] The Act was adopted "to ensure the public's right to attend the meetings of public agencies."[30]  And it was designed to facilitate public participation in local government decisions, and to curb misuse of the democratic process by secret legislation by public bodies.[31]  In enacting the statutory scheme, the Legislature declared:

> The people of this State do not yield their sovereignty to the agencies which serve them.  The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know.  The people insist on remaining informed so that they may retain control over the instruments they have created.[32]

The Brown Act's legislative history reveals an expanding definition of "legislative body."  As originally enacted, the term "legislative body" was defined simply as "the governing board, commission, directors or body of a local agency, or any board or

---

[27] See, e.g., former Ed. Code, §§ 966-967; Stats. 1963, ch. 629, § 2, p. 1517 (school boards).

[28] Oakes & Killingley, *supra*, at p. 7; see also *Sacramento Newspaper Guild v. Sacramento County Bd. of Sup'rs* (1968) 263 Cal.App.2d 41, 49-51 (discussing legislative history of the Act).

[29] Stats. 1953, ch. 1558, § 1.  The statutory scheme was not actually named the "Ralph M. Brown Act" until 1961.  (Stats. 1961, c. 115. § 1, p. 1127.)

[30] *Freedom Newsp. Inc. v. Orange Co. Employees Ret. Sys.* (1993) 6 Cal. 4th 821, 825.

[31] *Julian Volunteer Fire Co. Assn. v. Julian-Cuyamaca Fire Protection Dist.* (2021) 62 Cal.App.5th 583, 600-601; *Preven v. City of Los Angeles* (2019) 32 Cal.App.5th 925, 930; see also 61 Ops.Cal.Atty.Gen. 220, 225 (1978) ("[L]ong tradition preceding the Brown Act discloses a strong public policy against government conducted in secret and has led this office to conclude, as a matter of general policy, that 'doubtful cases should be resolved in favor of open and public meetings'").

[32] Gov. Code, § 54950.

22-402

commission thereof."[33]  The statute was amended in 1961 to add to the definition: "any board, commission, committee, or other body on which officers of a local agency serve in their official capacity as members and which is supported in whole or in part by funds provided by such agency, whether such board, commission, committee or other body is organized and operated by such local agency or by a private corporation."[34]  The Legislature clarified that "legislative body" as used in section 54952 "also includes, but is not limited to, planning commissions, library boards, recreation commissions, and other permanent boards or commissions of a local agency."[35]

In 1993, the Legislature proposed to reorganize and clarify the definitions of "legislative body."  Committee analysts observed that "[l]ocal agencies interpret the Brown Act in different ways.  Many legislative bodies find the Act confusing and hard to follow.  Some interpretations violate the spirit of the Brown Act if not its statutes."[36]  As amended, section 54952 defined "legislative body" to include the elected governing body; boards, commissions, committees and other temporary or permanent bodies created by formal action; bodies that govern private corporations created by the elected legislative body to exercise delegated authority, or which receive funds from the legislative body and whose membership includes a member of the legislative body appointed by the legislative body; and standing committees composed solely of members of the legislative body which are less than a quorum, and which are created by formal action and hold regular meetings.[37]

And in 2002, the Legislature again amended section 54952 to include the governing boards of a limited liability company as a legislative body in subdivision (c)(1)(A).[38]  In light of all of those amendments, one analysis observed that "[i]t is difficult to imagine a body within a county that raises or spends public monies that is not caught by the sweep of the phrase."[39]

In 2004, the Legislature proposed, and the voters approved, a sweeping amendment to section 3(b)(1) of article I of the California Constitution, enshrining the public's right of access in the state charter.  "The people have the right of access to

---

[33] Stats. 1953, ch. 1588, § 1, p. 3270

[34] Stats. 1961, ch. 1671, § 1, p. 3637.

[35] *Ibid.*, former Gov. Code, § 54952.5.

[36] See Sen. Local Gov. Comm., analysis of Sen. Bill No. 1140 (1993-1994 Reg. Sess.) as amended June 24, 1993, pp. 1-2.

[37] Stats. 1993, ch 1138, § 3, pp. 6387-6388.

[38] Stats. 2002, ch. 1073, § 2.

[39] Oakes & Killingley, *supra*, at p. 10.

information concerning the conduct of the people's business, and, therefore, the meetings of public bodies and the writings of public officials and agencies shall be open to public scrutiny."[40]  That same measure added a constitutional rule of construction, which provides:  "A statute, court rule, or other authority, including those in effect on the effective date of this subdivision, shall be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access."[41]

We are asked whether the SANDABS Executive Committee is a legislative body within the meaning of section 54952.  We are mindful that the point of the several statutory definitions of that term is not to provide "safe harbors" of technical requirements that offer opportunities to structure deliberative bodies for the purpose of circumventing the public's right of participation.  Rather, those definitions are intended to maximize the statute's reach in light of changing circumstances, consistent with Legislative intent and the intent of the voters.[42]  As a remedial statute, the Brown Act "should be construed liberally in favor of openness so as to accomplish its purpose and suppress the mischief at which it is directed."[43]  The public policy underlying enactment of the Brown Act cannot be avoided by subterfuge or evasion.[44]  "Unless for proper security reasons, the public has the right to be present and to be heard during all phases of

---

[40] Proposed Sen. Const. Amend 1 (2003-2004 Reg. Sess), Prop. 59, approved by the voters Nov. 2, 2004; see Cal. Const., art. I, § 3, subd. (b)(1).

[41] Prop. 59, *supra*; see Cal. Const., art. 1, § 3, subd. (b)(2).

[42] *Taxpayers for Livable Communities v. City of Malibu* (2005) 126 Cal.App.4th 1123, 1127 ("The act defines 'legislative body' broadly in order to avoid its circumvention"); *Joiner v. City of Sebastopol* (1981) 125 Cal.App.3d 799, 805, fn. 5 *(Joiner)* ("broad language used in the section to encompass the various modes by which such a body may be 'created,' evidences a legislative intent that the section be construed broadly to preclude evasion").

[43] *International Longshoremen's and Warehousemen's Union v. Los Angeles Export Terminal, Inc.* (1999) 69 Cal.App.4th 287, 294 (*International Longshoremen's*); *Epstein v. Hollywood Entertainment Dist. II Business Improvement Dist.* (2001) 87 Cal.App.4th 862, 869 (*Epstein*); 94 Ops.Cal.Atty.Gen. 33, 34-35 (2011).

[44] *Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 376 (serial communications); *Epstein*, *supra*, at p. 872; see also *Sacramento Newspaper Guild v. Sacramento County Bd. of Sup'rs*, *supra,* 263 Cal.App.2d at p. 50 (construing "meeting": "In this area of regulation, as well as others, a statute may push beyond debatable limits in order to block evasive techniques"); 79 Ops.Cal.Atty.Gen. 69, 74 (1996); cf. Gov. Code, § 54950 (". . . . The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. . . .").

legislative enactment by any governmental agency. This right is a source of strength to our Country and must be protected at all costs."[45]

**The SANDABS Executive Committee Is a Legislative Body Within the Meaning of Government Code Section 54952(c)(1)(A).**

As relevant here, Government Code section 54952 describes four types of legislative bodies:

> (a) The governing body of a local agency or any other local body created by state or federal statute.

> (b) A commission, committee, board, or other body of a local agency, whether permanent or temporary, decision-making or advisory, created by charter, ordinance, resolution, or formal action of a legislative body. . . .

> (c)(1) A board, commission, committee, or other multimember body that governs a private corporation, limited liability company, or other entity that either:

> (A) Is created by the elected legislative body in order to exercise authority that may lawfully be delegated by the elected governing body to a private corporation, limited liability company, or other entity.

> (B) Receives funds from a local agency and the membership of whose governing body includes a member of the legislative body of the local agency appointed to that governing body as a full voting member by the legislative body of the local agency.[46]

We will focus here on subdivision (c)(1)(A). The essential elements of this definition are (i) the legislative body must be a multimember governing body of an "*entity*," which is (ii) *created* by an elective legislative body, (iii) in order to *exercise authority that may lawfully be delegated* by the elected governing body to an entity. We will discuss each of these elements in turn.

---

[45] *Sacramento Newspaper Guild v. Sacramento County Bd. of Sup'rs*, *supra* 263 Cal.App.2d at p. 50, quoting Progress Report to the Legislature, Assembly Interim Comm. on Judiciary (1953 Reg. Sess.) p. 61 (internal quotation marks omitted).

[46] Gov. Code, § 54952.

22-402

## 1. SANDABS Is an "Entity" Within the Meaning of Subdivision (c)(1)(A)

SANDABS is neither a private corporation nor a limited liability company. It is embedded within the County Superintendent's office. It subsists entirely on public funds, which are collected from school districts by the County Superintendent, and are administered by him as part of the county schools' business-services budget.[47] SANDABS is accordingly an "other entity" within the meaning of subdivision (c)(1)(A).[48] In reaching this conclusion, we look to well-established rules of statutory construction to ascertain the Legislature's intent in order to effectuate the law's purpose.[49]

Words in statutes are generally accorded their usual, ordinary meaning, which in turn may be obtained by referring to a dictionary.[50] The term "entity" is commonly understood to mean "an organization (such as a business or governmental unit) that has an identity separate from those of its members."[51] For example, a labor union has been found to be an "entity" apart from its members "where the interests of justice indicate that this should be so, as in a personal injury action allegedly caused by the negligence of the union."[52] And the two examples of entities given in the statute—"private corporation" and "limited liability company"—are organizations that have an identity separate from that of its shareholders or members.[53]

The SANDABS members have demonstrated their intent that SANDABS manifest as an identity distinct from themselves. Thus, "SANDABS," as a distinct entity, is registered as a lobbyist employer with the Secretary of State.[54] The County

---

[47] See note 3, *ante*; Appx A, ¶ 4.

[48] SANDABS defines itself as a "volunteer committee" composed of local educational agencies within the county who execute an annual membership agreement and pay dues to the County Superintendent. (SANDABS Bylaws, *supra*, art. III.)

[49] 101 Ops.Cal.Atty.Gen. 24, 29 (2018).

[50] *Ibid.* & fn. 34.

[51] Merriam-Webster Online Dict., https://www.merriam-webster.com/dictionary/entity; see also Black's Law Dict. (11th 3d. 2019), Entity ("An organization (such as a business or a governmental unit) that has a legal identity apart from its members or owners").

[52] *Jones v. Workmen's Comp. Appeals Bd.* (1971) 20 Cal.App.3d 124, 128.

[53] See 9 Witkin, Summary 11th Corp. § 1 (2022); *Id.*, Partn. § 143 (2022).

[54] See, Gov. Code, § 82039.5 (defining "lobbyist employer"); Cal. Code Regs., tit. 2, § 18239.5 ("lobbyist employer"); see Cal. Sec. of State, Lobbying Activity, SANDABS, https://tinyurl.com/yja7w44v (website), https://tinyurl.com/2p8c4dcb (FPPC Form 602)

11

Superintendent, for example, is separately registered.[55]  And SANDABS appears in its own name on written materials in support of, or in opposition to, legislation.[56]

The County Superintendent acknowledges that "it is undisputed that the Executive Committee is a 'committee' of an 'entity' for purposes of satisfying the threshold question" whether the Executive Committee may be a legislative body under subdivision (c)(1)(A).[57]  We are satisfied that SANDABS is an "other entity" within the meaning of subdivision (c)(1)(A).

### 2. *SANDABS Is Created by the Governing Bodies of its Member School Districts*

When construing a statute, "[o]ur primary task . . . is to determine the intent of the Legislature, and we begin by looking to the statutory language."[58]  In determining such

---

(as of Feb. 27, 2024).

[55] Cal. Sec. of State, Lobbying Activity, San Bernardino County Superintendent of Schools, https://tinyurl.com/2dc6yrp5 (as of Feb. 27, 2024).  The Secretary of State's website shows that some school districts have also registered, or are currently registered, separately as lobbyist employers and have paid a lobbyist in the years indicated: Adelanto Elementary School District (2001-2002); Apple Valley Unified School District (2001); Bear Valley Unified School District (2000); Chino Valley Unified School District (2018); Fontana Unified School District (2023); Hesperia Unified School District (2018); Needles Unified School District (2015-2016); Ontario-Montclair School District (2021-2022); San Bernardino City Unified School District (2023); Victor Valley Union High School District (2008).  (See https://cal-access.sos.ca.gov/Lobbying/Employers/ (as of Feb. 27, 2024).)

[56] See, e.g., Assem. Comm. on Higher Ed, analysis of Assem. Bill No. 377 (2023-2024 Reg. Sess.) as amended Mar. 1, 2023, showing SANDABS as opposed to bill; Assem. Comm. on Ed., analysis of Assem. Bill No. 39 (2019-2020 Reg. Sess.) as amended Mar. 18, 2019, p. 8 (listing SANDABS in support of bill), available at https://tinyurl.com/yv23r2av (as of Feb. 27, 2024); see also Assem. Comm. Higher Ed., analysis of Assem. Bill No. 75 (2021-2022 Reg. Sess.) as amended Mar. 29, 2021, p. 8 (same); Assem. Comm. on Ed., analysis of Assem. Bill No. 92 (2021-2022 Reg. Sess.) as amended Mar. 25, 2021, p. 8 (same); Sen. Comm. on Ed., analysis of Assem. Bill No. 5 (2011-2012 Reg. Sess.) as amended Aug. 24, 2012, p. 13 (SANDABS listed as opposed); see also California County Superintendents, Floor Alert: Oppose AB388 (Medina), May 24, 2021, https://tinyurl.com/3y7w5k8d (as of Feb. 27, 2024.)

[57] Superintendent Letter, p. 8.

[58] *McCarther v. Pacific Telesis Group* (2010) 48 Cal.4th 104, 110.

22-402

intent, "[w]e must give 'the language its usual, ordinary import and accord[] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose.'"[59] But we must also "avoid interpretations and constructions which defy common sense or which might lead to mischief or absurdity, including literal meanings which would lead to a result not intended by the Legislature."[60] A narrow construction of the word "create," to mean only direct creation by an elected legislative body would invite evasion and subterfuge of the Act's purposes. As noted earlier, the statute should be "construed liberally in favor of openness so as to accomplish its purpose and suppress the mischief at which it is directed."[61]

Nothing in subdivision (c)(1)(A) requires a showing that the "entity" in question was created by a single elected legislative body. Thus, the Court of Appeal in *McKee v. Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force* held that a task force known as "L.A. Impact," created by multiple municipalities joining a memorandum of understanding, was subject to the Brown Act as an "entity" whose governing bodies constituted "legislative bodies" under subdivision (c)(1)(A).[62] Nor does anything in subdivision (c)(1)(A) require a showing that an elected legislative body *directly* created the entity. Accordingly, and consistent with the *McKee* court's reasoning, other courts have held that subdivision (c)(1)(A) is implicated if an elected legislative body merely "plays a role" in bringing the subject entity into existence.[63]

For example, the issue in *International Longshoremen's* was whether the governing body of a corporation, formed to construct and operate a coal-transfer terminal, was a legislative body within the meaning of subdivision (c)(1)(A).[64] The corporation

---

[59] *Ibid.*, quoting *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386- 1387.

[60] *Peters v. Superior Court* (2000) 79 Cal.App.4th 845, 849, internal quotation marks and citation omitted; see 64 Ops. Cal. Atty. Gen. 83, 85-86 (1981).

[61] *International Longshoremen's*, *supra*, 69 Cal.App.4th at p. 294.

[62] *McKee v. Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force* (2005) 134 Cal.App.4th 354, 363 ("various municipalities in Los Angeles County were involved in the creation of L.A. Impact"). The court also concluded that LA Impact could also be considered a joint powers authority, which would subject it to the provisions of the Brown Act as well. (*Ibid.*)

[63] See *Epstein*, *supra*, 87 Cal.App.4th at p. 870, citing *International Longshoremen's*, *supra*, 69 Cal.App.4th at p. 295; see also *Joiner v. City of Sebastopol*, *supra*, 125 Cal.App.3d at p. 805; 92 Ops.Cal.Atty.Gen. 102, 106 (2009) ("create" means "to produce or bring about a course of action or behavior").

[64] *International Longshoremen's*, *supra*, 69 Cal.App.4th at p. 295.

argued that its governing body was not a legislative body because it had been created by the Board of Harbor Commissioners, an appointed body. But the court held that the corporation's creation was nevertheless attributable to the city council (an elected legislative body), because the city council had "played a role" in the corporation's creation by approving an underlying business agreement without which the corporation's creation would not have gone forward.[65]

Relying on its earlier analysis in *International Longshoremen's*, the Court of Appeal in *Epstein v. Hollywood Entertainment Dist. II Business Improvement Dist.* reasoned that, for purposes of section 54952(c), a body is "'created by' charter, ordinance, resolution or other formal action of a legislative body if the legislative body 'played a role' in bringing [the body] 'into existence.'"[66] In *Epstein*, property owners had sued the property owners association that was managing the Hollywood Entertainment District Business Improvement District II (Second Improvement District) for violating the Brown Act.[67] The trial court held that the City had not created the association, which pre-existed the creation of the Second Improvement District by at least two years.[68] The Court of Appeal reversed.

The Court of Appeal noted that the City of Hollywood had previously passed a series of ordinances creating the Hollywood Entertainment Business Improvement District I (First Improvement District). The ordinances incorporated by reference a "Management District Plan," which provided that the First Improvement District would be governed by a non-profit property owners' association. The City later expanded the boundaries of the First Improvement District into what would become the Second Improvement District, and the property owners association simply continued to administer the assessments collected from the property owners.[69]

On these facts, the Court of Appeal firmly rejected the trial court's reasoning. The court stated that it "would improperly elevate form over substance" if it were to treat the property owners association as a "pre-existing" private entity with which the City just "happened" to decide to do business when it turned governance of Second Improvement District over to the property owners association.[70] "To turn a blind eye to such a subterfuge would allow City (and, potentially, other elected legislative bodies in the

---

[65] *Id.* at pp. 295-297; see also *Epstein*, *supra*, 87 Cal.App.4th at pp. 869-873.

[66] *Epstein*, *supra*, 87 Cal.App.4th at p. 864, quoting *International Longshoremen's*.

[67] *Ibid.*

[68] *Ibid.*

[69] *Epstein*, *supra*, 87 Cal.App.4th at pp. 865-866.

[70] *Id.* at p. 872.

14

future) to circumvent the requirements of the Brown Act, a statutory scheme designed to protect the public's interest in open government."[71]  Instead, the court held that the City had "played a role" in bringing the Improvement Districts and the property owners association that managed them into existence as the record indicated the association was "was formed and structured in such a way as to take over administrative functions that normally would be handled by City."[72]  Because the City had played a role in its creation, the property owners association was therefore a legislative body subject to the Brown Act within the meaning of section 54952(c)(1)(A).[73]

A similarly liberal construction of the term "created by" was taken in *Joiner v. City of Sebastopol*, where the Court of Appeal construed that term as found in former section 54952.3.  As in current section 54952(c)(1)(A), former section 54952.3 contemplated that certain multimember legislative bodies are "created by" by another legislative body.  In *Joiner*, the multimember body was an applicant advisory committee that comprised two members appointed by the city council and two members appointed by the planning commission.[74]  Significantly, former section 54952.3 required a showing that the creation was the result of "formal action of a legislative body."[75]  The *Joiner* court concluded that the city council's appointment of two of its members, and the council's adoption of the proposed agenda for the meeting, sufficed as the requisite formal action.[76]  Stated otherwise, it was enough that the city council played a role in creating the advisory committee.

We are confident that this judicial treatment of the word "create" is consistent with legislative intent.  In 2002, shortly after the decisions in *International Longshoremen's* and *Epstein*, the Legislature amended subdivision (c)(1)(A) to add "limited liability companies" to the enumerated examples of "entities."[77]  In doing so, the Legislature left the word "create" undisturbed.  "Where a statute has been construed by judicial decision, and that construction is not altered by subsequent legislation, it must be presumed that the Legislature is aware of the judicial construction and approves of it."[78]

---

[71] *Id.* at p. 873.

[72] *Ibid.*

[73] *Id.* at p. 876.

[74] *Joiner*, *supra*, 125 Cal.App.3d at pp. 801-802.

[75] See Stats. 1981, ch. 968, § 26, p. 3694 (emphasis added), repealed by Stats. 1993, ch. 1138, § 5; see now Gov. Code, § 54952, subd. (b).

[76] *Joiner*, *supra*, 125 Cal.App.3d at p. 805.

[77] Stats. 2002, ch. 1073, § 2.

[78] *People v. Hallner* (1954) 43 Cal.2d 715, 719; *Save Berkeley's Neighborhoods v.*

In our circumstance, the precise origins of SANDABS appear to be unknown. Our requestor tells us: "A review of archived San Bernardino County Board of Supervisors minutes did not reveal any information related to the creation of either SANDABS or the San Bernardino County School Boards Association. Neither the districts nor the county had any records relating to the creation of SANDABS."[79] Counsel for the County Superintendent has evidently advised our requestor that SANDABS was created by informal meetings and agreements between school district administrators in the late 1980s.[80] And there is some anecdotal evidence that SANDABS dates back to at least 1988.[81]

Notwithstanding the absence of an historic "paper trail," the conclusion that member school boards "played a role" in bringing SANDABS into existence seems unavoidable as its original existence would have depended on its constituent school boards' agreement to participate in its creation, and fund its activities. The SANDABS enterprise depends entirely on the pooling of funds by member school districts. And, indeed, SANDABS's viability can only be perpetuated by formal actions of multiple member school boards in conjunction with the County Superintendent. Member school boards annually take formal action to approve entry into the SANDABS annual agreement with the County Superintendent and the concomitant payment of dues.[82]

A SANDABS plan or program idea might have been initially created, in part, by a county superintendent acting on their own sometime in the 1980s. But SANDABS—at least in its current form—could not exist in the absence of member school districts whose

---

*Regents of the University of California* (2021) 70 Cal.App.5th 705, 720; see also *Estate of Griswold* (2001) 25 Cal.4th 904, 915-916; 90 Ops.Cal.Atty.Gen. 32, 37 (2007).

[79] Request for Opinion, p. 6.

[80] Request for Opinion, p. 2, fn. 1.

[81] See, e.g. Joan Moseley's Mountain Top Echoes, "Report from Potential Legislators Regarding Schools Available Online" (Oct. 15, 2014) ("The San Bernardino County District Advocates for Better Schools (SANDABS) executive committee, which is composed of nine board members, nine district superintendent[s] and the county superintendent, has surveyed state Senate and Assembly candidates since 1988"), available at https://tinyurl.com/mr3cvum3 (as of Feb. 27, 2024).

[82] See, e.g., CAHELP JPA, Governance Council Meeting Agenda (May 20, 2022), Item 8.1.4, available at https://tinyurl.com/yn9b4fm7 (as of Feb. 27, 2024); Central School Dist., Regular Meeting Board of Trustees (Jul. 8, 2021), Item 6.F., available at https://tinyurl.com/47h23n9d (as of Feb. 27, 2024).

22-402

boards agree to pay their "dues."[83]  Given the Brown Act's public access purpose, we decline to read the term "created" in a narrow or hyper-technical manner so as to allow an individual to initiate the creation of a policy body—whose original and continued existence depends upon formal approval (and funding) action by one or more legislative bodies—such that it escapes the public access and scrutiny that the Brown Act would otherwise require.  Again, "as a remedial statute, the Brown Act should be construed liberally in favor of openness so as to accomplish its purpose and suppress the mischief at which it is directed."[84]

Stated briefly, not unlike the circumstances in *International Longshoremen's*, SANDABS could never have existed, and cannot exist today, except for the participation of the school districts and their governing boards' annual vote to execute the membership agreement and approve funds for its support.[85]  Accordingly, we are persuaded that the governing boards of school districts would have, of necessity, "played a role" in creating SANDABS (as well as perpetuating its existence) for purposes of section 54952(c)(1)(A).

### 3.  *SANDABS Is Created In Order to Engage in Lawfully Delegated Legislative Advocacy in the Interest of the Member School Districts*

SANDABS appears to be a program whereby the County Superintendent of Schools endeavors to martial and manage the views of the various school districts on legislative matters of interest to the county schools in order to present a unified voice

---

[83] And this is so whether SANDABS is described as "an organization of school district board members and superintendents representing the member districts of San Bernardino County," (County Superintendent website, https://tinyurl.com/4msv5pb3 (as of Feb. 27, 2024), or as a "volunteer committee" whose members include all the school districts in San Bernardino County that have entered into the annual membership agreement and paid their allotted dues (SANDABS Bylaws, arts. I, III.  Executive Committee members may represent only local education agencies that are "in good standing" with SANDABS.  (*Id.,* arts. IV, § 1, V, § 1; SBCSBA Bylaws, art. X, § 1).  Notably, the SANDABS bylaws state that SANDABS consists of only those districts that have entered into the annual membership agreement and paid "dues" as required.  (SANDABS Bylaws, art. III, § 2.)

[84] *International Longshoremen's*, *supra*, 69 Cal.App.4th at p. 294.

[85] *Id.* at p. 295, fn. 2 ("Although LAXT contends it was created by the collective action of all of its shareholders rather than by any governmental entity, absent this approval by the City Council authorizing the Harbor Department to enter into the shareholders' agreement, LAXT could not have been created").

22-402

before the Legislature and Congress.  As noted earlier, the County Superintendent enjoys considerable influence in the affairs of the SANDABS Executive Committee.

According to its bylaws, SANDABS's sole activity is "influencing the adoption of thoughtful state and federal legislation."[86]  To this end, SANDABS contracts with lobbyist firms.[87]  This activity, as we noted earlier, is an activity in which school districts are authorized to engage in individually.[88]  SANDABS channels this individual authority, held separately by some 30 school districts, to a single entity that is administered by the Office of the County Superintendent, thus enabling educational agencies in San Bernardino County to speak with one "official" voice on legislative matters.

School boards in San Bernardino County permit district funds to be used to pay for SANDABS's contract lobbyists, in exchange for the Executive Committee's promise to undertake enumerated responsibilities around legislative advocacy.  Those responsibilities include adopting "positions relative to the proposed legislation, regulations, or budget proposals most critical to SANDABS state and federal legislative platform priorities"—which the Executive Committee is responsible for adopting.[89]  In every reasonable sense, by contracting with the SANDABS Executive Committee to carry out the itemized responsibilities related to legislative advocacy before the Legislature and Congress, the member school boards have extended to the Executive Committee their individual authority to do these things.

The County Superintendent suggests that the governing boards have not delegated their authority to SANDABS because the Executive Committee "operates independently of [local education agencies], which may choose to voluntarily join and support its efforts through the payment of membership dues."[90]  But this is immaterial to the question whether—for purposes of the Brown Act—there has been a delegation of authority by at least some of the school boards.

For us to find subdivision (c)(1)(A) applicable, it is not necessary that SANDABS have been delegated final authority, or the totality of a school board's legislative-advocacy authority, such that the school board has no reserved right to lobby for its

---

[86] SANDABS Bylaws, art. II; and see note 3, *ante* (budget management narrative describes SANDABS as a "legislative advocacy group").

[87] See note 52, *ante* (discussing SANDABS as "lobbyist employer"); see also SANDABS Bylaws, *supra*, art. XI, § 1.

[88] See note 53, *ante*, and accompanying text.  (Gov. Code, § 53060.5.)

[89] Appx. A ("RESPONSIBILITIES OF COMMITTEE").

[90] County Superintendent Letter, p. 8.

22-402

district.[91]  Indeed, subdivision (c)(1)(A) expressly refers to authority that may be *lawfully* delegated, which may necessitate a less than complete delegation—i.e., less than final authority or less than complete control.[92]

Moreover, we are persuaded that giving the word "delegate" a narrow meaning would be inconsistent with the Legislature's intent.  We note that the Legislature's 1993 amendment of section 54952(b) ensured that the term "legislative body" would encompass even an advisory committee, if that committee has a continuing subject matter jurisdiction.[93]  We think it unlikely that the Legislature intended subdivision (c)(1)(A)'s coverage to be limited only to entities to which final authority had been delegated, but nevertheless extended to advisory bodies having a continuing subject matter jurisdiction.  Especially in construing the Brown Act, we "follow the construction that 'comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.'"[94]

On its face, subdivision (c)(1)(A) describes an entity that "is created by the elected legislative body in order to exercise authority that may lawfully be delegated by the elected governing body."[95]  No adjective or phrase—such as "full" or "complete"— qualifies "authority."  Our task is not to insert such qualifying language or to rewrite the statute to conform to an assumed intention that does not appear from its language.[96]

The very impact of the SANDABS enterprise in the Legislature and Congress depends on member school districts delegating at least some portion of their decision-making power relating to, and their voices on, legislative matters, to a centralized entity administered by the County Superintendent of Schools.  SANDABS has been (and continues to be) created by the school boards of San Bernardino County to engage in

---

[91] And see note 55, *ante* (listing individual school-district registered lobbyist employers).

[92] Cf., *Lehane v. City etc. of San Francisco* (1972) 30 Cal.App.3d 1051, 1054-1055 (complete delegation of legislative authority may be unconstitutional).

[93] Stats. 1993, ch. 1138. § 3; Gov. Code, § 54952, subd. (b).

[94] *Chaffee v. San Francisco Library Com.* (2004) 115 Cal.App.4th 461, 468; and see *Rao v. Campo* (1991) 233 Cal.App.3d 1557, 1567 ("It is a well-settled principle of statutory interpretation that the various parts of a statute must be considered as a whole to avoid absurd or anomalous results by harmonizing any apparently conflicting provisions; and thus, a particular part of a statutory enactment must be viewed in light of the enactment in its entirety").

[95] Gov. Code, § 54952, subd. (c)(1)(A).

[96] 62 Ops.Cal.Atty.Gen. 394, 396 (1979).

legislative advocacy on behalf of the member districts.  We are persuaded that SANDABS is an entity within the meaning of subdivision (c)(1)(A) that is created by its member school districts "to exercise authority that may lawfully be delegated" by them to SANDABS.

### 4. *The SANDABS Executive Committee Is the Multimember Body that Governs SANDABS*

Finally, the County Superintendent acknowledges that the Executive Committee is the "governing body" that "manages" SANDABS.[97]  Moreover, the Bylaws description of the Executive Committee's responsibilities confirms the County Superintendent's acknowledgment.  We therefore conclude that the SANDABS Executive Committee is the "multimember body that governs" SANDABS within the meaning of Government Code section 54952, subdivision (c)(1)(A), and is therefore a "legislative body" within the meaning of that section and subject to the Brown Act's open-meeting requirements.

---

[97] Superintendent Letter, p. 2.

22-402

**Opinion No. 22-402**

**APPENDIX A**

21


San Bernardino
County
Superintendent of
Schools

**SAN BERNARDINO COUNTY DISTRICT ADVOCATES FOR BETTER SCHOOLS**
**(SANDABS)**
**MEMBERSHIP AGREEMENT**
**AGREEMENT NO. 18/19-0365**

THIS AGREEMENT, made and entered into between the SANDABS Executive Committee, hereinafter known as "**COMMITTEE**", and the San Bernardino County Superintendent of Schools, hereinafter known as "**SUPERINTENDENT**" and the Upland Unified School District hereinafter known as "**MEMBER**", mutually agree to the following terms and procedures for the conduct of San Bernardino County District Advocates for Better Schools, hereinafter known as "**SANDABS**".

1. RESPONSIBILITIES OF **SUPERINTENDENT**
   a. The **SUPERINTENDENT** shall designate staff in the Intergovernmental Relations department to support and facilitate the activities of **SANDABS**. These duties shall include, but not be limited to, preparation and distribution of meeting notices and appropriate backup materials, agendas, minutes and correspondence.

   b. The **SUPERINTENDENT** shall provide meeting facilities in the Roy C Hill Education Center for the **COMMITTEE**, standing committees and ad hoc committees as appropriate.

   c. The **SUPERINTENDENT** is eligible for membership and shall pay an annual membership fee as determined by **COMMITTEE**.

2. RESPONSIBILITIES OF **COMMITTEE**
   a. The **COMMITTEE** shall represent all members of **SANDABS** pursuant to the Bylaws.

   b. The **COMMITTEE** shall provide copies of all correspondence, minutes, position statements and other pertinent materials to all members of **SANDABS**. Verbal reports shall be provided at all district superintendent and San Bernardino County School Boards' Association Executive Committee and general meetings.

   c. The **COMMITTEE** shall respond to requests of members relative to legislation affecting public education. This response may include, but is not limited to, a review by **COMMITTEE** for the purpose of adopting a position on specific legislation.

3. RESPONSIBILITIES OF **MEMBER**
   a. **MEMBER** shall pay an annual membership fee on a fiscal year basis according to a schedule adopted by **COMMITTEE**.

   b. **MEMBER** shall support, to the extent possible, the activities of **COMMITTEE** in the form of correspondence and contact with legislators representing San Bernardino County.

4. MEMBERSHIP FEE SCHEDULE
   The membership fee schedule for 2018-19, based on prior year P-2 revenue limit ADA, shall be as follows:

   | | | |
   |---|---|---|
   | ROP's, SELPA's and County Superintendent | = | $200 |
   | Less than 1,000 ADA | = | $125 |
   | 1,001 to 2,500 ADA | = | $300 |
   | 2,501 to 5,000 ADA | = | $500 |
   | 5,001 to 10,000 ADA | = | $1,000 |
   | Over 10,000 ADA | = | $2,000 |

Payment of membership fees shall be made by a transfer from the **MEMBER'S** general fund to the **SANDABS** account established by the **SUPERINTENDENT** on or before October 1, 2018 or by warrant payable to the **SUPERINTENDENT**.

The **MEMBER** hereby certifies that prior year P-2 revenue limit ADA was 10,389and accordingly, will pay a membership of $2000.00 for 2018-19.

5.  TERM OF AGREEMENT
    The term of the Agreement shall be from July 1, 2018 to June 30, 2019.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed.

**SAN BERNARDINO COUNTY**
**SUPERINTENDENT OF SCHOOLS**

Terrie S. Johnson, Purchasing/Bids Supervisor
Purchasing/Contracts

Date: 8|30|18

**UPLAND UNIFIED**
**SCHOOL DISTRICT**

Dr. Nancy Kelly, Superintendent

Date: 9-12-18